1819.
June (E. S.)

Pennington
vs
Bordley

PENNINGTON *vs*. BORDLEY, *et al*. Lessee.

APPEAL from *Cecil* County Court. Ejectment for a tract of land called *Painter's Rest*. The defendant in the court below, (the present appellant,) took defence upon warrant, and plots were made. At the trial the plaintiff offered in evidence the plots in the cause, and the surveyor's explanations of the same, and gave in evidence the certificate of survey of the tract of land called *Painter's Rest*, made for *Nicholas Painter*, on the 10th of Nov. 1677, and describing the land as "lying on the east side of *Chesapeake* Bay, and on the north side of a river called *Sassafras* River, beginning at a marked red oak standing on a bank by the side of the said river, and running up the said river S E for breadth 450 perches, to a marked red oak standing on a point of a neck called *Jugen Cabin Neck*, and running from said red oak with a line drawn N E into the woods for length 533⅔ perches, then from the end of the N E line with a line drawn N W 450 perches, then from the end of the N W line with a straight line to the first marked red oak, containing 1500 acres more or less." The plaintiff also gave in evidence the certificate of resurvey of *Painter's Rest*, made for and in the name of *Nicholas Painter*, on the 17th of December 1678, "lying on the north side of *Sassafras* river, at the head of the said river, in *Cecil county*, beginning at a marked chesnut tree standing on a bank by a valley near the river side, being an easterly bounded tree of a parcel of land laid out for *Samuel Hill*, and from thence bounded with the river on the S by a line drawn E S E 75 perches, to a marked red oak standing on a bank by the river, being the *first bounded tree of the former survey*, and from the said red oak, bounded with the river and the main branch of the river, by a line drawn east southerly 475 perches, to a marked red oak standing by the side of a branch re-

*Margin note.*—A tract of land called *Painter's Rest* was surveyed in 1678, "beginning at a marked chesnut tree standing on a bank by a valley near the river side, being an easterly bounded tree of a parcel of land laid out for S H, and from thence bounded with the river on the S by a line drawn E S E 75 ps. to a marked red oak standing on a bank by the river, being the first bounded tree of the former survey, and from the said oak, bounded with the river, and the main branch of the river, by a line drawn E southerly 475 ps. to a marked red oak standing by the side of a branch, respecting a fork of the branch on the opposite side, & running from the said red oak, by a line drawn N E 535 ps. and from the end of the N E line, by a line drawn W N W 435 ps. and from the end of the W N W line, with a straight line 730 ps. to the first bounded chesnut."

A tract of land called *Heath's Range*, was surveyed in 1704, "beginning at a marked black oak standing at the end of the N E line of *Painter's Rest*, and running thence *with Painter's* line *W N W* 435 ps, thence *along and with Painter's* last line *S* 36 *W* 210 ps. to the heads of the lands surveyed from the river side, then N W along and with the heads of the said lands," &c. On the question, whether the expressions in the grant of *Heath's Range*, which calls for the W N W and the home lines of *Painter's Rest*, imperatively bind *Heath's Range* with *Painter's Rest* on those two lines.

The county court were of opinion that the expressions in the grant of *Heath's Range* were imperative, controlling both courses and distances, and that the lines of *Heath's Range* must be either enlarged or shortened, so as to correspond with the true location of *Painter's Rest*; but that the jury were to decide on the facts, and that they were the sole judges what was the true location of *Painter's Rest*, and to determine in what manner *Heath's Range* was surveyed, whether agreeably to what the defendant contends to be the true location of *Painter's Rest*, or whether as corresponding to the grant of that tract as located by the plaintiff. On appeal *reversed*.

The end of the N E line of *Painter's Rest* is the beginning of *Heath's Range*. The grant of the last tract contains a double description of the place of beginning, and that ought to be adopted, which from the expressions of the grant is most certain and most conformable to the intention of the parties to be collected from the grant. If it could be done consistently with the proof, the location ought to be made so as to comply with those descriptions. Per *Chase*, Ch. J.

*Heath's Range* must begin at the end of the N. E. line of *Painter's Rest*, wherever the jury may find the same to be, and bind with *Painter's Rest*, as expressed in the grant, unless the boundary called for as the beginning of *Heath's Range* is proved, in that case *Heath's Range* must begin at the said boundary; and if such boundary does not stand in the W N W line, then a course must be shaped in the nearest direction to strike the said W N W line, and then the first and second lines of *Heath's Range* must bind on *Painter's Rest*, as expressed in the grant. Per *Dorsey*, J.

The exposition of deeds or grants is solely confided to the court, and their construction must be made on the expressions of the grant, and not on facts *aliunde*.

If a grant is susceptible of only one location, as to the description of the land intended to be passed, it is the sole and exclusive right and power of the court to decide on its true construction; and if the call, in the opinion of the court, is imperative, it is to be gratified, and the course and distance rejected.

A tree called for is not more certain than a line of a tract of land. They are to be rendered certain by proof, and can be identified in no other way—a tree being a natural and visible object, is not more capable of proof than a line.

1819.

Pennington
vs
Bordley

specting a fork of the branch on the opposite side, and running from the said red oak by a line drawn N E 535 perches, and from the end of the N E line by a line drawn W N W 435 perches, and from the end of the W N W line with a straight line 730 perches, to the first bounded chesnut, containing 1630 acres of land more or less." The plaintiff also gave in evidence the certificate of resurvey of *Painter's Rest*, made for and in the name of *Thomas Bordley* on the 3d of October 1724, under a special warrant to resurvey *Painter's Rest*, surveyed on the 10th of November 1677, and resurveyed on the 17th of December 1678, "beginning at a marked chesnut tree standing on a bank by a valley near the river side, being an easterly bounded tree of a parcel of land laid out for *Samuel Hill*, and running from the said chesnut down the said valley, and up and with the river, S 62 W 14 perches, then S 29 W 11 perches, then S 86 E 24 perches, then S 29 E 12 perches, then S 8 perches, then S 35 W 10 perches, then S 17 E 26 perches, then N 54 E 64 perches, then S 77 E 34 perches, then N 80 E 11 perches, then N 82 E 8 perches, to a marked red oak standing on a bank by the river, *being the first bounded tree of the original survey*, and from the said oak, up the natural courses of the river and main branch, E 64 perches, then N 62 E 20 perches, then N 22 W 18 perches, then N 5 E 20 perches, then N 86 E 23 perches, then N 75 E 34 perches, then N 80 E 67 perches, then S 52 E 46 perches, then N 80 E 18 perches, then N 36 perches, then E S E 195 perches, to the side of a branch respecting a fork on the opposite side, *being the place where the third boundary tree stood*, which tree being gone there is now *bound* a *bound* white oak standing by the branch side, respecting a fork on the opposite side, and running from the said white oak N E 535 perches, then W N W 435 perches, thence a straight line to the beginning tree, containing 1616 acres more or less; also added two parcels of vacancy, the first *beginning at the third bounded tree of the said land resurveyed, and running*," &c. "containing 75 acres more or less; and the second parcel of vacancy beginning," &c. "containing 210 acres more or less; which said three parcels of land contain in the whole 1901 acres." The plaintiff also gave in evidence a patent for the last mentioned land, granted to *Thomas Bordley* on the 24th of October 1724. He also gave in evidence certificates of several other tracts, which it is not material particularly to notice.

The plaintiff also offered in evidence, that the said tracts of land, as also that part of the lands contained in the patent of *Painter's Rest*, dated 24th of October 1724, and the certificate of *Painter's Rest*, dated 3d of October 1724, called the second vacancies, were correctly located by him on the plots. He also offered in evidence, that the black oak tree called for as the beginning of *Heath's Range*, stood at the place marked on the plots by the red letter A, and that at that place a stone which was hewed

at *Philadelphia*, and on which the letters H R ft. pt. was engraved or cut, at the instance of *Daniel Charles Heath*, the then proprietor of the land, except that part of *Heath's Range* included in a deed from *James Heath* to *Otho Othoson*, dated the 10th of May 1706, was about thirty years ago, by him said *Heath*, in the presence of a number of persons, fixed and placed to perpetuate the place where the beginning tree of *Heath's Range*, first part, originally stood. The plaintiff also offered in evidence that the lessors of the plaintiff had title to the lands contained in the said certificate of *Painter's Rest*, dated 3d of October 1724, and in the patent for said lands dated the 24th of October 1724. The defendant then also offered in evidence the plots and explanations of the surveyor, and the locations thereon made by him, (which are made part of this bill of exceptions,) and gave and read in evidence the certificate of *Painter's Rest*, dated the 10th of November 1677, and also the certificate of *Painter's Rest*, dated the 17th of December 1678; also the certificate of *Painter's Rest*, dated the 3d of October 1724; the certificate of *Green Spring*, dated 24th of October 1680; the certificate of *Martin's Nest*, dated 24th of October 1680; and the certificate of *Heath's Range*, the first part, dated 31st of August 1704; all of which are the same certificates which were read by the plaintiff, and which have been before inserted. He further gave in evidence the patent of *Heath's Range*, granted to *James Heath* the 18th of February 1705, also a deed from *James Heath* to *Otho Othoson*, dated the 10th of May 1706, for "all that parcel of land, being part of a tract of land called *Heath's Range*, the first part, lying at the head of *Sassafras* river, in *Cecil* county, surveyed for the said *Heath* the 31st of August 1704, beginning at the end of the first line of the said land, and running along the second line thereof S 36 W 210 perches, to the head of the lands surveyed from the river side, and is also along with the last line of *Painter's Rest* to the said head lands, then N W with the said head lands 60 perches, to the W corner of *Norland*, then along the head of *Daley's Desire* N 62 W 308 perches to the N E corner of *Colleton*, thence a right line to the first tree, containing 229 acres, or thereabouts." The defendant also, for the purpose of proving the true location of *Painter's Rest*, surveyed the 17th of December 1678, proved that *James Ford*, one of the witnesses who was sworn on the survey, is since dead, and then read in evidence his deposition, which had been taken on the survey to the third boundary of *Painter's Rest*, on the 25th of February 1814, which stated "that the white oak stump, at the side of the dry branch respecting a fork of *Sassafras* river, at the end of the third boundary of *Painter's Rest*, nigh to which a large stone is laid on the ground also nigh to a large black walnut tree, was shewn to the deponent by the late *Robert Milligan*, *John Gheas*, and *William Humphreys*, late surveyor of *Cecil* county, as a boundary of

1819.

Pennington
vs
Bordley

*Painter's Rest*, but does not recollect which of the surveys it was said to be a boundary of." The defendant then prayed the court to direct the jury, that if they should believe the true location of the W N W line of *Painter's Rest*, resurveyed for *Nicholas Painter*, the 17th of December 1678, to be from the black letter C to the black letter D, that then, whether they shall find the beginning of *Heath's Range* to be at the black C, or at the red A, that the first line of *Heath's Range* cannot be extended beyond the black letter D, but must there stop, so that the second line of *Heath's Range* shall run along with *Painter's* last line 210 perches, to the head of the lands surveyed from the river side, according to the call in the certificate and patent of *Heath's Range*. And the plaintiff also prayed the court at the same time to direct the jury, that if they should be of opinion from the evidence, that at the time of making the survey of *Heath's Range*, the first part, *James Heath* considered the location of *Painter's Rest* as surveyed in 1678, to run from black A to black R, and thence to E, and thence N E 535 perches, and thence W N W 435 perches, and thence to the beginning, and actually marked a tree for his beginning at or near the end of the N E line at red A, and surveyed the first and second line of his survey according to such location of *Painter's Rest*, the jury ought to locate the tract of land called *Heath's Range*, the first part, agreeably to such location of *Painter's Rest*, whether such location be the true location thereof or not; and the Court, [*Purnell*, A. J.] upon both prayers gave the following instructions to the jury: At the trial of this cause, some terms past, a prayer was preferred by the defendant's counsel similar to the one now submitted by him, and in the consideration of that prayer it became necessary to determine on the construction of the certificate of *Heath's Range* in 1704, whether it contained such doubtfulness or ambiguity as to render it the peculiar province of the jury to determine, or whether the calls were imperative, and made it proper for the court to instruct the jury. It was contended, on that occasion, as in the present, that it was a subject solely for the consideration of the jury; but I entertained a different opinion, and did instruct the jury. The expressions of *Heath's Range* are, that it shall begin at a marked black oak standing at the end of the N E line of *Painter's Rest*, resurveyed for *Nicholas Painter*, December 17, 1678, and running thence with *Painter's* line, W N W 435 perches, thence along and with *Painter's* last line S 36° W 210 perches, to the head of the lands surveyed from the river side. These expressions I considered imperative, controling both courses and distances, and that the lines of *Heath's Range* must be either enlarged or shortened, so as to correspond with the true location of *Painter's Rest*. And this opinion I must entertain on the present occasion, subject to a modification that could not be let in on the former trial, because the plots would not authorise it.

It is therefore my opinion, that if the jury believe the true location of the W N W line of *Painter's Rest*, surveyed for *Nicholas Painter* on the 17th of December 1678, to be from the black letter C to the black letter D, that then, whether the jury shall find the beginning of *Heath's Range* to be at black C or red letter A, the first line of *Heath's Range* cannot extend beyond the black letter D, and that the second line of *Heath's Range* must run along with *Painter's* last line 210 perches, to the head of the lands surveyed from the river, unless the jury should be of opinion, from the evidence in the cause, that at the time of making the survey of *Heath's Range*, the first part, *James Heath* considered the location of *Painter's Rest*, as surveyed in 1678, to run from A to R, to E, to red V, to red B, and then to the beginning, and actually marked a tree for his beginning at or near the end of the N E line at red A, and surveyed the first and second line of his survey according to such location of *Painter's Rest*, then the jury ought to locate *Heath's Range*, the first part, according to such location. This last part of my opinion is induced by the decision in the case of *Tenant vs. Hambleton*, (3 *Harr. & Johns.* 233.) On all the facts it is for the jury to decide; they are the sole judges what is the true location of *Painter's Rest*. They are also to determine in what manner *Heath's Range*, the first part, was surveyed and taken up, whether agreeably to what the defendant contends to be the true location of *Painter's Rest*, or whether as corresponding to the certificate of *Painter's Rest* of 1678, as located by the plaintiff. These are all facts for the consideration of the jury, in which the court will in no sort interfere. The defendant excepted; and the verdict and judgment being for the plaintiff, the present appeal was prosecuted by the defendant.

### THE PLAT EXPLAINED.

By the plots in the cause it appears that the plaintiff located *Painter's Rest*, surveyed the 17th of December 1678, beginning at A, running to R, to E, to red A, to green R, and then to A. The defendant located the same tract beginning at A, running to R, to B, to C, to D, and then to A. The plaintiff located *Heath's Range*, the first part, beginning at red A, running to red B, to red C, to red D, to red E, to red F, to red X, &c. The defendant located that tract beginning at C, running to D, to red R, to the head of the lands surveyed from the river side, &c. He located that tract a second way, beginning at C, running to red A, to red V, (near red A,) to D, to red R, &c. They differed as to the termination of the second line of *Painter's Rest*; the plaintiff contended that it ended at E, and the defendant that it ended at B.

The cause was argued in this court at June term 1818, before CHASE, Ch. J. and BUCHANAN, JOHNSON, MARTIN, and DORSEY, J.

*Carmichael* and *Chambers,* for the Appellant. They cited *Norwood vs. Carroll et al. Lessee,* (5 *Harr. & Johns.* 163.) *Roseberry vs Carson,* (in the general court for the E. S.) *Trammell's Lessee vs. Nelson,* 2 *Harr. & M·Hen.* 4. *Helm's Lessee vs. Howard, Ibid* 82. *Paca's Lessee vs. Norwood, Ibid* 175. *Calhoun & Roger's Lessee vs. Hall, Ibid* 416. *Dougherty's Lessee vs. Denny,* 3 *Harr. M·Hen.* 430. *Hamilton's Lessee vs. Cawood & Blacklock, Ibid* 437. *Ashton vs. Hammond, Land. Hold. Ass.* 407. *Tenant vs. Hambleton,* 3 *Harr. & Johns.* 233. *Green vs. M·Clellan,* (*ante* 200;) and *Ridgely et ux. Lessee vs. Norwood,* 1 *Harr. & Johns.* 128.

*Martin,* (Attorney General) and *Hammond,* for the Appellee, cited *Helm's Lessee vs. Howard.* 2 *Harr. & M·Hen.* 82. *Dorsey's Lessee vs. Hammond,* 1 *Harr. & Johns.* 190. *Phillip's Evid.* 410. *Peake's Evid.* 116. 3 *Bac. Ab.* 388, 389. *Keech's Lessee vs. Dansey,* 1 *Harr. & M·Hen.* 21. *Chamberlaine's Lessee vs. Crawford, Ibid* 360. *Llewellins' Lessee vs. Fendall & Simmons, Ibid* 244. *Ridgely et ux. Lessee vs. Norwood,* 1 *Harr. & Johns.* 128. *Martin's Lessee vs. Muse,* (in the general court about 1793.) *Thompson et al Lessee vs. Brown,* 1 *Harr. & Johns,* 385. *Davis et al. Lessee vs. Battee, Ibid* 264. *Tenant vs. Hambleton,* 3 *Harr. & Johns.* 233. *Shield's Lessee vs. Miller,* (*ante* 1.) *Dougherty's Lessee vs. Denny,* 3 *Harr. & M·Hen.* 430. *Webb's Lessee vs. Beard,* 1 *Harr. & Johns.* 349. *Smith's Lessee vs. Volgamot & White,* 2 *Harr. & M·Hen.* 155. *Calhoun & Rogers Lessee vs. Hall, Ibid* 416. *Rench vs. Beltzhoover,* 3 *Harr & Johns.* 469. *Johnson vs. Hawn, Land. Hold. Ass.* 417. *Hammond et al. Lessee vs. Norris,* 2 *Harr. & Johns.* 130; and *Hamilton's Lessee vs. Cawood & Blacklock,* 3 *Harr. & M·Hen.* 437.

The cause was continued under a *curia* until this term, when the judges delivered their opinions seriatim.

CHASE, Ch. J. The question in this case depends on what is the true location of the tract of land called *Painter's Rest,* resurveyed in 1678. There can be no doubt about the true construction of the grant of that land; and the position of it must depend on the finding of the jury as to the place where the third boundary, the red oak called for, stood. If at black E, then the N E line will terminate at red V, if at black B, then the N E line will end at black C.

I consider the end of the N E line of *Painter's Rest,* the beginning of *Heath's Range,* the first part.

The grant of *Heath's Range* contains a double description of the place of beginning, and that ought to be adopt-

1819.

Pennington
vs
Bordley

ed which from the words and expressions of the grant is most certain and most conformable to the intention of the parties to be collected from the grant. The description is "beginning at a marked black oak," which forms the first part of the description, "standing at the end of the N E line of *Painter's Rest,*" which forms the second part of the description.

Standing thus without any additional expressions designating more certainly the place of beginning, the tree would be preferred if it did not stand at the end of the line; but the following words, "running thence with *Painter's* line W N W 455 perches," &c. indicate plainly and unequivocally the intention to be to fix the beginning at the end of the N E line, and entitles it to the preference, because the calls "running thence with *Painter's* line," which are imperative, could not be gratified without establishing the beginning at the end of the N E line, and because it was the intention to make *Painter's Rest* the boundary to the extent of the said two courses. If it can be done, consistent with the proof, the location ought to be made so as to comply with both descriptions. From the beginning it is to run, "thence with *Painter's* line W N W 435 perches, thence along and with *Painter's* last line S 36° W 210 perches, to the heads of the lands surveyed from the river side." In case the 210 perches will not extend to the heads of the said lands, then the line is to be elongated, and the courses varied to gratify the said calls, which are imperative.

The end of a line is as certain as the tree from whence the line is to run, and excluding the idea of the variation of the compass, must invariably terminate at the same identical spot; and there could be only one location, because the course cannot be varied, nor can the number of perches be diminished or increased.

An allowance being made for the variation of the compass, is for the sole purpose of ascertaining the true position of the land according to the original survey, and divers locations are made by the contending parties according to their different views, and the jury decide on the proof which is the true location, according to the same kind of evidence which is admissible to prove calls; and the jury make such an allowance, according to the proof, which will fix the true location thereof, there being no certain rule established by law to guide them in making such allowance.

If the tree should be considered as best entitled to a preference, then a course must be shaped from the tree to the end of the N E line, to gratify the calls in the subsequent expressions, "binding on *Painter's Rest,*" on the same principle that lines are elongated or shortened, and the courses varied, to comply with calls; and on the same principle, that where the beginning is a tree standing by the river side, and the tree is distant several perches from the river, and the subsequent course is then binding on the river, a course is supplied to run to the river to gratify the call.

It has been contended by the counsel that this is the case of a latent ambiguity, and that the tree called for, if it does not stand at the end of the N E line, is entitled to the preference; that the call for the end of the N E line is not imperative, and that the jury are at liberty to give such a location to *Heath's Range*, the first part, as they may think right, without regarding the calls.

In all ejectments in which the controversy is about the location of the land, the land must be located according to the different views or pretensions of the litigant parties. To support these locations the evidence is introduced on which the questions of law arise, as to the true location of the land, which must conform to the true exposition of the grant.

The plot exhibits to the view of the court the position of the land, the courses and distances, and calls, that the court may decide on the true construction of the grant, and the legality of the evidence offered as applicable to it, and the legal sufficiency of it. The exhibition of the plot, on which the lands are located, can in no wise limit, control or change, the legal and constitutional power of the court in deciding on the construction of the grant.

A latent ambiguity is that kind of ambiguity which is concealed or not apparent on the face or inspection of the grant, but is created by the admission of parol evidence, showing that there are two tracts of land to which the description in the grant is applicable, which renders it uncertain which was intended to pass by the grant, and that uncertainty is removed by the same kind of evidence; and so in the case where there are two trees set up to gratify the call, or two places set up as the head of the creek called for. In all these cases the jury ascertains and fixes the call according to the testimony legally admissible by the court.

If the grant, according to the principles established by the court, is susceptible of only one location, as to the description of the land intended to pass, it is the sole and exclusive right and power of the court to decide on the true construction of the grant; and if the call, in the opinion of the court, is imperative, the call is to be gratified, and the course and distance rejected. According to these principles, which are too firmly established to be shaken or controverted, the decision of the court, in the case of *Howard and Helms, (2 Harr. & M'Hen.* 82,) is right, in refusing to give the instruction to the jury, which was prayed by the counsel for the plaintiff, as to the true construction of the grant of *Cole's Harbour.* The expressions in the grant are as follows: "Beginning at a bounded white oak, (which was admitted,) and running west to the mouth of a small gut, and over the said gut, and bounding on the said N W branch for the length of 320 perches, then N N E 275 perches, then E 320 perches, bounded on the east by a line drawn S S W to the bounded tree." It was also admitted that the N W branch was truly delineated on the plot. According to the established principle, that an imperative call must be gratified, and the course and dis-

1819.

Pennington
vs
Bordley

tance rejected, if they do not correspond with the call, the plain and obvious construction of the grant of *Cole's Harbour* is to run from the beginning 320 perches, bounding on the N W branch, then N N E 275 perches, then E 320 perches, bounded on the E by a line drawn S S W to the first bounded tree. This is the only construction and location of which the grant is susceptible, and the court gave the right judgment in refusing to grant the direction of the prayer of the plaintiff's counsel, which was to run course and distance from the beginning, without regarding the call, *(bounding on the N W branch,)* which call unquestionably is imperative. The court, in expressing their judgment, are incorrect in the reasons they assign for it. The call, bounding on the N W branch, being imperative and binding, precluded all question about the true location of *Cole's Harbour,* which must be according to the call, rejecting course and distance. The description of the land intended to pass by the grant is definite and certain, if the call bounding on the N W branch is allowed to be imperative, and it is capable only of one location. If there had been two streams set up as the N W branch, one party contending for one stream, and the other party for the other, it would have been the case of a double location, and for the jury to ascertain according to the proof to which stream the expressions in the grant were applicable.

The courts since, in many instances, have been misled by the reasoning of the court in *Howard and Helms,* and appear to have adopted the reasons of the court as the judgment of the court.

The case of *Dorsey and Hammond, (1 Harr. & Johns. 190,)* is the case of an imperative call as to the grant of *Dryer's Inheritance,* and capable of only one location, and so the general court decided. The court of appeals reversed the judgment, adopting the reasoning of the court in *Howard and Helms,* on the ground that it was capable of a double location.

In the case of *Gibson's Lessee against Smyth, (1 Harr. & Johns. 253.)* the general court decided, that running with a tract of land was imperative, and that the course must be varied to gratify it; and this judgment was affirmed by the court of appeals. The question depended on the true construction of the grant of *Kirkham.*

In the case of *Thompson and Brown, (1 Harr. & Johns. 335,)* the call is for a beach tree, and is imperative. The grant of *Anthrapp* is capable of one location only.

It is observable that in the grant of *Painter's Rest* the red oaks, set up by the different parties, are distant from each other about two hundred perches, which is an additional proof that a tree called for is not more certain than a line of a tract. They are to be rendered certain by proof, and can be identified in no other way; a tree being a natural and visible object, is not more capable of proof than a line. The tree was visible only to the surveyor and chaincarriers at the time of the survey, and all the knowledge

that can be obtained of it is derived from that source, being transmitted down by hearsay, the most vague and uncertain of all proof; and it is well known that opinions and misunderstandings of what was communicated, are substituted in the place of facts, not unfrequently, which is the cause of so much contest about the tree called for. The true reason for giving the preference to calls, is assigned in the case of *Norwood vs. Carroll, et al. Lessee. (5 Harr. & Johns.* 153,) on the principle that such construction was most beneficial for the grantee.

If the grant of *Cole's Harbour*, in the case of *Howard and Helms*, is to be considered as a grant susceptible of a double location, and the reasoning of the court adopted as the law, then that great principle of giving a preference to calls, generally recognized, and firmly established, will be subverted, and there is no case but what must be submitted to the decision of the jury, from whose verdict there is no appeal, and the power and jurisdiction of the court to decide on the true construction of grants would be transferred to the jury. The necessary result would be uncertainty, and endless litigation; one jury would decide according to calls, another according to course and distance; ejectment would follow ejectment, until the weaker party, worn out by anxiety, and oppressed by the heavy expenses attending ejectments, must yield to his opulent and powerful neighbour.

BUCHANAN, J. *(a)*. My opinion is, that the judgment of the county court ought to be reversed. The case of *Kirkpatrick's Lessee vs. Kyger,* 1 *Harr. & Johns.* 298, *Howard vs. Moale, et al. Lessee, Norwood vs. Carroll, et al. Lessee, Rench vs. Beltzhoover, Shields' Lessee vs. Miller,* and *Green vs. M'Clellan,* all in this court, are in point, and are cases of calls by junior tracts of land, not by natural or fixed artificial boundaries, but to *lines* of elder tracts.

JOHNSON, J. The question submitted for the decision of the court in this case is, in what manner a tract of land called *Heath's Range* ought to be located.

On a careful examination of all the authorities cited at the argument, and all others I have been able to find having relation to this question, it seems to me very evident that irreconcilable decisions have been made in the county court, in the general court, and also in the court of appeals.

Since I have been on the bench my invariable rule has been, in the trial of cases coming before me, first to ascertain which of the parties has the merits on his side, and having discovered that, to decide in his favour, unless I find myself hindered from doing so by certain and well es-

*(a) Buchanan,* J. being prevented by indisposition from attending the court at this term, communicated this opinion in a letter to the Ch. J.

1819.

Pennington
vs
Bordley

tablished principles of law. That cases do sometimes arise where courts of law find themselves unable to extend relief to the party justly entitled to it, because of some fixed principle of law, must be admitted by those conversant with their proceedings. The less frequent such cases occur, the more pleasing and satisfactory must be the duty of those who have the law to administer. I have, and shall, therefore, ever yield relief to the claims of justice in the absence of clear and indisputable rules of law; where those rules do exist I must, of course, be bound by them. But I do not think it my duty, as surely it is not my inclination, to shut my ears to the call of justice, unless forced to do so by law cogent and inflexible. With these preliminary remarks I will proceed to the investigation of this case.

The purchaser of land, whether from the community or an individual, ought to obtain, in justice, the very land he purchases, and if there be any mistake in the instrument of conveyance by which such purchase is intended to be consummated, by which the purchaser may be thrown off the land purchased, though he might be cast on other land belonging to the vendor at the time of the purchase, and which the vendor may be willing to substitute for the part actually sold and intended to be conveyed, yet a power should exist somewhere by which such mistake might be rectified.

If a person affected by such a mistake is entitled to relief, and should not be compelled to take other land belonging to the vendor, how much stronger claim has he to protection, who, by a similar mistake, is prevented from obtaining any land at all—who is shut out, not only from the land he intended to purchase, but has no other land given him in lieu of it?

It is presumed that no one can question the propriety of granting relief in such cases. It may, however, be urged, that relief in cases of that description, cannot be given by courts of common law, they being bound to administer justice according to clear and established principles of law, their hands being tied by the peremptory directions of the law; and that those rules had better be adhered to, though individual loss should be thereby sustained. That there are cases where the rules of law are so rigid, as to produce individual injustice in courts of common law, and to force the parties to go elsewhere for relief, is most certain; and it is also certain, that even in courts of equity, which are less fettered by positive rule, redress in all cases cannot be obtained. The good of the community, however, and the advancement of individual justice, are best promoted by confining those rules to cases over which their dominion is already most clearly established. With these principles for my guide, I approach the consideration of the question in this case, viz. In what manner the tract of land called *Heath's Range* ought to be located?

On the 31st of August 1704, *Heath's Range,* contain-

1819.

Pennington
vs
Bordley

ing 1850 acres of land, was surveyed. The description of the survey, so far as it is material to the question before the court, was as follows: "Beginning at a *marked black oak standing at the end of the N E line* of *Painter's Rest* resurveyed, and running with *Painter's* line W N W 435 *ps.* thence along and *with Painter's last line,* S 30° W 210 ps. to the head of the lands surveyed from the river side, then *N W* along and with the heads of the said lands 60 ps. to the west corner of a tract called *Norland,* and to the east corner of another tract called *Dayly's Desire,* then along the head of that tract N 62° W 308 ps." &c.

.The material description of *Painter's Rest* resurveyed, the first tract called for, is "Beginning at a bounded chesnut, and running" a course specified in the certificate, (which is immaterial to the present question,) "to a marked red oak, being the first bounded tree of the former survey, and running from thence with the river by a line drawn southerly 475 ps. to a marked red oak, from thence *by a line N E* 535 ps. then W N W 435 ps. and then with a straight line 735 ps. to the beginning." On comparing the above certificates it will be perceived that a material difference exists between them, in relation to the description of the spot where the N E 535 ps. line of *Painter's Rest* resurveyed terminated; the one describing *the end* by the number of perches alone, and the other calling for a *marked oak* standing at the end of that line; the one calling to run the next W N W line 435 ps. from the *spot* where the 535 ps. line ended, the other calling to run the same course 435 ps. from where the tree stood. If then, when *Heath's Range* was surveyed the parties were mistaken as to the *place* where the N E line terminated, and fixed the boundary of the beginning of *Heath's Range* in the W N W line of *Painter's Rest,* and not at the commencement of that line, (the same being the termination of the N E line,) it must, of course, follow, that to the same extent the beginning was set along the W N W line, the corresponding line of *Heath's Range* must go beyond the termination of the same line of *Painter's Rest,* and of course the next line of *Heath's Range,* not being at the same termination with the line of *Painter's Rest,* could not run with its last line the number of perches called for in the last survey.

It is contended, on the part of the appellant, that the first line of *Heath's Range,* no matter where the tree called for as its beginning stands, must terminate with the W N W line of *Painter's Rest,* without regard to the manner in which that land was run at the time *Heath's Range* was taken up.

It is evident that if *Heath's Range* must be so run, and its beginning is not at the end of the N E line of *Painter's Rest,* the land actually surveyed, and the land designed to be purchased, will not pass by the grant. Here it may be asked, why shall the expression in the second course, calling to run a described course with the last line of

1819.

Pennington
vs
Bordley

*Painter's Rest* resurveyed produce such an effect? Is it because thereby more precision and certainty is obtained as to the real location of the land, or is it because in doing otherwise the record is contradicted, and by letting in extrinsic circumstances, confusion and uncertainty are produced with regard to the position of the land granted? No such consequences can follow.

To my comprehension all the evils that can arise take their origin from limiting and confining a junior survey, containing a reference to the lines of an elder tract to the true location of such elder tract, and in not permitting the junior survey to embrace the land it would have comprehended, by running the elder survey at *the trial of the cause*, in the *same way* it was run when the junior survey was made. Can the W N W line in the certificate of *Heath's Range*, calling to run the same *course and distance* with *Painter's Rest*, deviate in the smallest degree from the same ground it would have covered, supposing the words *with that line* had been omitted? Were there, at the time *Heath's Range* was surveyed, any *marks or traces* on the ground to shew at what place the line of *Painter's Rest* run, when *Painter's Rest* was taken up? Or was not the word *with* inserted because the commencement, course and termination of the two tracts, were supposed to be and were laid off as the same?

But the question for the decision of the court is, admitting the tree called for as the beginning of *Heath's Range* is not the end of the N E corner of *Painter's Rest*, and of course not at the commencement of the W N W line of that tract, the W N W line of *Heath's Range must of necessity*, (not may only,) end with it.

Again it may be asked why must it there end? Doth it give greater certainty of locations by binding the position of a junior survey so as to make it tally with the original location of the tract called for, when that original location, at the time of the last survey, was unknown to all those engaged in taking up the land? All that can be said, as to the expression *running with the last line of Painter's Rest*, is that having in the preceding course begun at, or supposed to have begun, run with and terminated at, the same place, the next line would run with the last line of *Painter's Rest*, but as they do not terminate at the same place, they cannot run together unless the preceding line of *Heath's Range* is diminished in its distance 180 ps. And must the call, such as it is, produce that effect?

On principles of justice the land intended to be bought and sold ought to pass by the conveyance, but if the lines of the grant are to be diminished, the whole land cannot pass. Where are these firmly established principles to be found, that will increase or diminish the distance when no visible objects are called for and *explicitly described as boundaries*? But when even *such visible objects* are mentioned in the certificate, if not described with that absolute certainty to make them *unquestionable* boundaries, then, whether they *bind or not* must depend on the opinion of the

jury, from all circumstances. ascertaining whether or not the land, when run out, extended to such visible and natural objects.

If then, on principles of equity and justice, the land intended to be purchased should pass, and that no greater certainty to the location of land is obtained by restraining the course and distance of a junior survey, calling to run to and with the lines of an elder survey, nay, that locations are more uncertain in proportion as you drive the parties' claiming under them back to more antient dates. than they would be if the more recent surveys were allowed to control; it only remains to be considered, have the decisions given to such expressions that obligatory force that this court is now bound to yield to them? Although all the decisions are not to be reconciled, yet it appears to me, after a careful examination of them, their weight is in favour of the opinion pronounced by the judge below. The first description of cases that I shall notice are those where the jury were left to ascertain the location of the land when the expressions used, even in regard to visible natural objects, were so used as not *evidently* to disclose that such objects were described as bounds. In such cases. whether bounds or not, is made to depend on the running at the time the land was taken up, to be ascertained by acts of possession, and every other circumstance by which the actual running in the opinion of the jury is established. In *Helm's Lessee vs. Howard*, 2 Har. & M·Hen. 82. it was determined that a grant calling to run *up* or *along* with a river, and *not* calling to run *with* or *bounded by* the river, was a proper subject for the consideration of the jury, whose duty it was to bind with the river or not as they should find the land to have run *when taken up*.

In *Martin's Lessee vs. Muse*, (General Court, E S. about 1793,) a tract of land called to run to a tree, at the river side, and then *down* the river to a tree, a course and distance expressed. By running the course from the one tree to the other, a piece of vacant land was made to appear between the line and the river. This was also left to the jury, and there was no appeal from the decision. The general court were consistent in these decisions. In *Davis' Lessee vs. Battee*, 1 Harr. & Johns. 264, the general court determined that *Selby's Marsh bound* on the river, if the jury believed that the river was *truly located*. The court of appeals *reversed* the decision, on the ground that the expressions in the grant were *doubtful*, and were therefore proper to be left to the jury. In *Dorsey's Lessee vs. Hammond*, 1 Harr. & Johns. 190, the question arose on a tract of land calling to begin at a tree on the east side of *Patuxent* river, and then running into the woods a certain course to another bounded tree, and then another course to a bounded tree on *Patuxent* river, and then running and *binding on Patuxent river* a short course and distance, and then several other short courses, until they approached the beginning tree on *Patuxent* river; the general court determin-

1819.
Pennington
vs
Bordley

ed that the *first short course* was bound by the river, and that all the others *must* run course and distance, with such variation as the jury might allow, except the last that call-ed to run to the beginning. The court of appeals reversed the judgment, on the ground that the jury should ascertain how the land was run, *and if run with the river when the land was taken up,* the river must bound the survey.

Other cases exist confirmatory of the principle, that where the expressions used are doubtful, whether the ob-ject expressed was intended to bind or not, are for the con-sideration of the jury. On this subject only one other case will be stated. In *Thompson's Lessee vs. Brown*, 1 *Harr. & Johns*. 335, the court were called on to say, when a line called to run from a tree on the river side *up the river* to another tree on the river, any land lying between the river and that line passed by the grant. The general court de-termined that it did not. The court of appeals reversed this opinion, the subject being proper for the consideration of the jury.

The next class of cases to be referred to are those where the lines of junior surveys call for the lines of elder tracts. These decisions, I apprehend, support the judgment pro-nounced by the county court in this case.

In *Ridgely & wife Lessee vs. Norwood*, 1 *Harr. & Johns*. 128, the court was called on to say, that a tract of land, called *United Friendship*, which called to run to and with a tract of land, called *Yates his Forbearance, must* run to and *with* that tract, those courses of *United Friendship* that it called to run with. The Court, *Duvall* and *Done* judges, refused to give the direction. On appeal this de-cision was affirmed in the court of appeals by *Rumsey*, Ch. J. and *Mackall, Jones, Potts,* and *Dennis,* Judges.

The next case is *Tenant vs. Hambleton*, 3 *Harr. & Johns*. 233, where this court determined, that in locating a junior survey calling for an elder survey, that the elder must be run as it was in fact run at the time the junior survey was made. The tract called for contained calls, and therefore, if at the time the second survey was made it was run by its calls, they may govern, if not, then the courses and distances were to prevail. *Green vs. M'Clel-lan,* (*ante* 200,) was where a younger tract called to be-gin at the end of the *second line* of an older tract. *Balti-more* county court was called on to instruct the jury, that in fixing on the beginning of the last survey they were not bound to place it at the termination of the second line of the original tract, according to its original location, but at the spot where that was found to be when the second sur-vey was made. The court gave, in conformity, as I ap-prehend, with the prior decisions, the direction prayed for.

At the time when the above mentioned survey was made, (whose place of beginning was the object sought for,) the variation of the needle was not so well known as to justify a surveyor, or a court, to run the location of a tract of land, containing only courses and distances, other

wise than the needle pointed at the time of running—of course to call for the end of such a line, containing only course and distance, was the same as to say according as the needle then pointed *"et expressio eorum qui taciter insunt nihil operatur."*

From the view I have taken of the decisions of the court of appeals, so far as the same has yet extended, it will appear that they have been uniformly consistent. To reconcile however all the decisions made by the general court on this subject seems to be rather a difficult task. And notwithstanding the great talents of those who presided in that court, when we consider that their memories were unaided with reports of their decisions, our surprise is not that some of them have been found to clash, but that so much consistency has been preserved. Nothing but the extensive learning which adorned that bench, could have prevented more discordant decisions. With these remarks, I come now to the review of two recent determinations of this court, on which reliance must be placed to reverse the judgment of the court below in the case before us. The first is *Carroll, et al. Lessee vs. Norwood,* determined at December term 1812, (5 *Harr. & Johns.* 163.)

It will be perceived, that this decision was made nine years after the judgment of the court of appeals, in the case of *Ridgely and wife, vs. Norwood,* which was founded on the same certificate, and one year after the case of *Tenant vs. Hambleton* was adjudged. And to take away from the judgment in the case of *Carroll vs. Norwood,* its binding authority, it may be remarked, that it was bottomed on the case of *Thompson vs. Brown,* which had been decided by the general court in 1803, and that too at a time when that case had five years before been reversed by this court. The case then of *Carroll vs. Norwood,* was made to rest on a decision which had been overruled when *Carroll and Norwood* was determined.

In the last mentioned case the court below were called on to instruct the jury, that a tract of land called *United Friendship,* which called to run to and with a tract called *Yates his Forbearance,* several courses, when said last tract had no such courses as those called for, must, without regard to the courses of the latter certificate, expend the number of perches said to run with *Yates his Forbearance,* on the lines of that tract. This direction the court refused to give, and on an appeal, their judgment was reversed; and as it appears to me in hostility to the principles, which the court of appeals had themselves previously established. But it is alleged that the decision by the general court in the case of *Howard vs. Moale, et al. Lessee,* which was in 1808, affirmed by this court, 2 *Harr. & Johns.* 249, was inconsistent with the judgment of the court below in the present case.

On an examination of the case of *Howard and Moale* it will be found, I think, not to interfere in the slightest degree with the case under consideration.

1819.

Pennington
vs
Bordley

In that case the question was, in what manner the two first lines of a tract of land called *David's Fancy* (an escheat grant) should be located. *David's Fancy*, the original tract on which the escheat issued, is described "as beginning at a bounded locust tree being the north east bounded tree of *David Poole's* land called *"Upton Court*, and running by the land of said *Poole*, east 65 ps. to a *bounded oak*, then N E 150 ps. to a bounded oak of said *Poole's* land." *David's Fancy*, the escheat, calls to begin "at a *locust* now bounded at or very near the place where stood a bounded locust, the original beginning tree of a tract of land called *Upton Court* formerly laid out for *David Poole*, and running thence with the land east 65 ps. (it being expressed in the certificate of the original survey to run by the land of the said *Poole* E 65 ps. to a bounded oak which cannot be found) thence N E 238 ps. still bounding on the said land to the N W branch of *Patapsco* river, it being therein expressed to run N E 150 ps. to a bounded red oak of said *Poole's* land, and the certificate of the said *Poole's* land mentioning to run that course to a bounded red oak standing by the side of the said N W branch, which oak is not known."

The general court determined that if *David's Fancy* is rightfully located on the plots, at the termination of the 12th line of *Upton Court*, and there is no evidence of the existence of any such tree as called for at the termination of the first line of *David's Fancy*, which would vary the same from the course and distance of the 13th line of *Upton Court*, that then the expressions in the escheat grant, do, by operation of law, bind the escheat grant to the true location of the original tract called *David's Fancy*, as to *the two first lines thereof*, so far as the jury find the second line of *David's Fancy* (the original,) did actually extend, and that the first and second lines of *David's Fancy*, do, by virtue of the expressions therein contained, bind the said lines on the 13th and 14th lines of *Upton Court*.

This decision amounts to nothing more than this, that where a junior survey calls to a tree as the beginning of another tract, and then to run with it to the 2d and 3d boundaries of the original tract, such junior survey must run to, and be governed by, the lines of the original tract, if the bounds of such original tract are known, as they also are the bounds of the junior survey, but if they are not known the junior survey must then be governed by the legal location of the elder tract, as the same can be ascertained at the trial of the cause.

What application then has that decision, to prove that a junior survey calling to run with the lines of an elder survey must, in every instance, run to, and be governed by, such survey, even when such survey contains expressions which cannot be gratified, if its location is made to correspond with that of the original tract, or rather expressions directly inconsistent with such corresponding location.

Is it not manifest, that when the junior tract called for the boundary of an elder tract, and to run with that tract to another boundary, that at the time when the junior survey was made, the location of the elder tract was known, and was run with it.

If then, by lapse of time, the bounds of the one are lost, so must also be the bounds of the other, and as they would have run together if the bounds were known, so must they run together course and distance, when the bounds are lost.

The next case relied on is *Rench vs. Beltzhoover,* 3 *Harr. & Johns.* 469. In that case four bills of exceptions were taken to the opinion of the court below, which opinion, upon two of them, was reversed, and upon two affirmed. The court below determined that where one *tract called for another* the tract called for could only be ascertained by its patent name. In that case the defendant offered in evidence the grant of a tract of land called *The Resurvey on Dawson's Strife,* the twenty first line of which was N 72° W 170 ps. to the end of 226 ps. on the second line of a tract called *Long Meadow,* and running with said land W 358 ps. The 2d line of *Long Meadow,* (the tract called for,) had only 140 ps. but another tract called *Long Meadow Enlarged,* had a line with 226 ps. The plaintiff then offered to prove that by reputation *Long Meadow Enlarged* had acquired the name of *Long Meadow;* this proof the court below rejected, and that opinion was reversed.

In the third bill of exceptions the court instructed the jury, that if they found that there were not 226 ps. on the second line of *Long Meadow,* as called for in the grant of *The Resurvey on Dawson's Strife,* that then in law the call could not be gratified, and that they must run course and distance as to that line with or without variation.

In the *fourth* bill of exceptions the 21st line of *The Resurvey on Dawson's Strife* calls to terminate at the end of 226 ps. on the second line of a tract called *Long Meadow,* and the 22d line calling to run with said tract. The court were called on to direct the jury, that the 22d line must run with it although the line called for by the 21st course had not 226 ps. but only 140 ps. This instruction the court refused to give, they being of opinion that the 22d was a dependant location on the 21st line, and must commence where the 21st ends, and if the 21st line could not be gratified, that then the 22d must commence and run from where the 21st ended without regard to the call. These opinions were confirmed by this court.

It seems extraordinary that this case should be relied on as directly in point against the judgment of the court below in the one now under consideration. For when they are compared, I think it will be manifest, that so far from being an authority for the appellant, it is one for the appellee.

In the case now before the court, the tract of land called *Heath's Range,* calls to begin at a tree standing at the end of the N E line of *Painter's Rest,* and running with that

1819.

Pennington
vs
Bordley

tract W N W 435 ps. and then the next line with the last line of the tract called for.

If then the tree, (the beginning of *Heath's Range*) does not stand at the end of the N E line of *Painter's Rest*, then that part of the description cannot be gratified if there are not 435 ps. on the W N W line of *Painter's Rest*. From the tree, you cannot run the number of ps. with it; and as the next line is (according to the case of *Rench vs. Beltzhoover*,) made to run from the end of the 435 ps. line, it can never be made to run with the last line of *Painter's Rest*, no more than in the case produced, could the 22d line of *The Resurvey on Dawson's Strife* be made to run with *Long Meadow*; but the line following the W N W line of *Heath's Range* must commence from the end of the 435 ps. without any regard to the true legal location of the last line of *Painter's Rest*.

The next case that came before this court, was *M'Clellan and Green*, *(ante* 200.) And here also the judgment of the county court, pronounced in correspondence with the decisions of the court of appeals existing at the time the county court gave judgment, was reversed. The reversal, as I apprehend, was produced in a considerable degree, by the recent decision in the case of *Carroll vs. Norwood*. If there was no other reason to be urged against that determination, save only that such principles must for ever exclude the land intended to be or actually taken up, perhaps its authority ought to be small; but when it is remembered that it rests in a great degree on the judgment pronounced by the general court in *Thompson vs. Brown*, the reversal of which, I presume, was unknown to this court when the case of *Carroll vs. Norwood* was determined; when a former general court on the same identical certificate had given a different judgment, which was affirmed by the court of appeals, the decision as authority is shaken to its foundation.

The last case that has been brought to the attention of the court is that of *Pumphrey vs. Ashpaw*, *(ante* 368.) In this case land taken up when you were authorised to lay down grants of land different from the point of the needle, or in other words to allow for the variation of the compass, a tract is taken up, calling to run to the lines of another tract, as laid down with a specified variation, and with the tract certain lines with the same specific variation. *Anne Arundel* County Court determined, that notwithstanding the manner in which the old tract was specially described when the younger survey was made, yet that description must have no effect; that the jury must first ascertain the original location of the old tract, and the last must be governed by it.

In 1818 this judgment was reversed by this court, and by this reversal it would seem that the decision of this court in the case of *Green vs. M'Clellan*, is greatly weakened; for the only difference as appears to me is that

in the case of *Pumphrey vs. Ashpaw*, the certificate *expresses* what was as clearly *implied* in *Green vs. M'Clellan.*

In forming opinions on the effect of grants having relation to prior surveys, we ought steadily to keep in mind that it is the *last* and not the *first* survey the construction of which is sought; it is the confounding them together in the minds of those whose province it is to expound them, that has caused, as I believe, a difference of opinion.

As to the general rules of construction, that you cannot, by matter extrinsic to the grant or record, *contradict* it, whether the extrinsic matter depends on other grants or records, upon the most authentic ancient charts or surveys, or on the most conclusive parol proof, is conceded; the difference of opinion arises in the application. If the ancient grant is the one to be expounded, then its exposition cannot be influenced by any of those circumstances mentioned; but we have not the survey of the *first* land under consideration, it is not the grant of *Painter's Rest* resurveyed, but of *Heath's Range*, a subsequent survey, that is now to be construed; and the construction to be applied to it can never, in the slightest degree, influence the construction of *Painter's Rest.*

The decision of this court in *Pumphrey vs. Ashpaw*, (which took place after all the arguments advanced in this case were heard, and the bearing of all the authorities on the subject duly considered,) in my opinion has established the correct principle, to wit, that the junior survey must be run as it was run when the land was taken up, if there are any *expressions* in the junior survey to permit such a location.

In that case the tract called for was taken up a great many years before the survey of the land, the certificate and grant for which were under consideration; but as that certificate described *the manner* in which the original was run, it was consistent with the second grant to give it that location, although in doing so the ancient survey would not be run as it was when taken up. The junior survey did not call for it, according to its *original* or *primitive* location, it called for it as run *when the junior tract* was taken up; with its first position the last tract had no connexion, and therefore, when the land comprehended in the last survey was the subject under consideration, so far from being *contradictory* to, it was perfectly consistent with its certificate to locate *the first* survey in the *manner described* by the last.

A similar course of reasoning, I should have supposed, ought to have produced a different judgment than was pronounced in the case of *Green vs. M'Clellan.* There the *place* sought for was the *beginning* of a tract of land called *M'Clellan's First Venture*, which did not call for any visible object, but described its place of beginning as being at *the end of the second line* of a tract called *Come by Chance.* At the time *M'Clellan's* survey was made, the *end of the second line* of *Come by Chance* could only have been as-

certained by running the actual courses and distances as described in the certificate. At that time if an ejectment had been brought for *Come by Chance,* the patent in support of the action could not have been read if the land had been laid down on the plots in the cause with any the least variation from the course and distance described. Nay, after *M'Clellan's First Venture* had been taken up, and before the law passed permitting an allowance to be made for the variation of the needle, had an action of ejectment been brought for that land, *its beginning* could only be ascertained by running the two first lines of *Come by Chance* as the needle then pointed. The certificate of *M'Clellan's* land does not describe its place of beginning to be at the end of the second line of the other tract, according to its *primitive* location; nor doth it describe it as then ascertained by running at the point of the needle; but as it could not have been run except in that manner, the beginning, I humbly apprehend, should have been ascertained by fixing on the spot where the second line then terminated.

The only remark to be urged against the correctness of the reasons already advanced is, that the defendant's survey must be run according to the original location of the elder tract, or otherwise the tract called for is made to have two positions or locations.

The objection seems to me to have been already substantially answered. But is there any thing inconsistent with the second grant, to locate it as actually run, when the grant contains no expressions inconsistent with such a location?

The subsequent survey does not declare that the land called for was run by its original legal location; and all surveys now, and all containing calls, and courses and distances, before the variation of the needle was admitted to exist, have two legal locations, and which shall prevail depends *on the existence of facts* at the time the survey is called in question. Where there are calls to natural visible objects, and they can be proved, the courses and distances must yield to them; where the calls cannot be proved, the courses and distances govern.

Now, if such must be the case when the extent of the land comprehended in the original grant was the question under the consideration of a court and jury, ought not the same principles to apply to a junior survey, calling for such elder survey, where the bounds of the elder survey were unknown at the time the second survey was made?

The same course of reasoning is applicable, in as strong a degree, to the cause now before the court.

*Heath's Range* calls to "*begin at an oak standing at the end of the N E line of Painter's Rest resurveyed, and to run with Painter's line W N W 435 ps.*" and then another course with *Painter's* last line. It will be observed, that no tree is called for in the certificate of *Painter's* land at the end of the N E line. When *Heath's Range* was run the tree called for as its beginning is also *describ-*

ed as standing at the end of the N E line of the other land. If you make the place where the tree stands the end of the N E line, then there exists a W N W line 435 ps. of *Painter's* land, with which the W N W line of *Heath's Range* can run, and then the next line of *Heath's Range* will run with the last line of *Painter's* land. But if the tree is not at the beginning of the W N W line of *Painter's* land, but 180 ps. on it, then will *Heath's Range* extend 180 ps. beyond the W N W line of *Painter's Rest*, and of course the next line cannot run with the last line of that survey. The land therefore called *Painter's Rest Resurveyed*, as described in *Heath's Range*, is that tract terminating the N E line at the oak; is that tract running a W N W line 435 ps. from the oak—and its last line to the beginning, presenting corresponding lines with *Heath's* survey.

But we have seen, by the decision of this court in the case of *Pumphrey vs. Ashpaw*, that where the original survey called for is described, (in the certificate of the tract calling for it,) as running in a specified manner, in locating the junior tract the first survey must be laid down to identify the last land taken up as it was run at the time of the last survey; and therefore, as the certificate of *Heath's Range*, by calling for a tree standing at the end of the N E line of *Painter's* land, when no such tree is called for in that certificate, the court below did not err when they directed the jury, that if they should believe, from the evidence in the cause, that at the time *Heath's Range* was surveyed the W N W line of *Painter's Rest* run from the oak, and then the last line to the beginning, and that the two first lines of *Heath's Range* run accordingly with them, that then that was the legal location of the last mentioned tract.

MARTIN, J. I concur in the opinion that the judgment of the court below in this case be reversed.

DORSEY, J. The tract of land called *Heath's Range*, according to its certificate bearing date the 31st of August 1704, begins at a marked black oak standing at the end of the N E line of *Painter's Rest*, resurveyed for *Richard Painter* the 17th of December 1678, and running thence with *Painter's* line, W N W 435 perches, thence along and with *Painter's* last line, S 36° W 210 perches, to the head of the lands surveyed from the river side, then N W along and with the heads of said lands.

*Painter's Rest*, surveyed for *Richard Painter* on the 17th of December 1678, after running two courses, which are immaterial to the decision of the question before the court, begins for the third line at a marked red oak, the boundary of the second line, and runs from the said red oak by a line drawn N E 535 perches, and from the end of the N E line, by a line drawn W N W 435 perches, and from the end of the W N W line, with a straight line 730 perches, to the beginning.

1819.

Pennington
vs
Bordley

The question submitted to the court is this—Do the expressions in the certificate of *Heath's Range*, which call for the W N W and the home lines of *Painter's Rest*, imperatively bind *Heath's Range* with *Painter's Rest* on those two lines?

I deem it unnecessary to examine the authorities which have been cited by the counsel on either side, as many of them are contradictory, and few of them profess to give the reasons on which the decisions were made.

I hold it to be an unquestionable principle of law, that the exposition of deeds or grants is solely confided to the court, and that their construction must be made on the terms or expressions of the grant, and not on facts *aliunde*.

Every grant presents two considerations to the court, the thing or corpus intended to be conveyed, and the quality of the estate in the thing. The description of the subject of the grant, as well as the estate therein intended to be conveyed, is part of the grant. That the court alone can decide on the nature of the estate, will not be controverted; but as the court cannot decide on the quality of the estate until the certainty of the subject matter thereof is ascertained, it would seem to follow, that the description of the thing is to be judged of by the court, especially as both of them are parts of the same contract.

It is a maxim of our law, that the subject matter of the grant must be described by intelligible and apt terms, or the deed is void; and who declares the grant void? The court; but if the court were not the sole and exclusive judges of the description, they would usurp authority by exercising this jurisdiction.

When a line has course and distance, and a call, if both cannot be gratified, one or the other must yield, or the deed will be void for repugnancy; and therefore, the courts of this state have decided, that the call shall be gratified at the expense of the course and distance. Calls are of different kinds, as of a tree, a stone, or a tract of land, and it would be difficult to assign a reason why the two first should be imperative, and the last not so. The true position of the tract of land called for, is matter of as much certainty as a tree.

By calling for another tract of land, and running with it, the party, if we may judge from the certificate, (and we have no right to seek for his intention elsewhere,) certainly intended to bind his land with the elder survey, and if such was his intention apparent on the face of the grant, we are bound to gratify it. To submit this question of intention to the jury, to be decided on testimony *de hors* the grant, would be productive of great uncertainty and endless controversy.

I am therefore of opinion, that *Heath's Range* must begin at the end of the north east line of *Painter's Rest*, wherever the jury may find the same to be, and bind with *Painter's Rest* as expressed in the certificate, unless the boundary called for as the beginning of *Heath's Range* is

proved, in that case *Heath's Range* must begin at the said boundary, (it being the object called for, and the expression standing at the end of the north east line, being matter of description;) and if such boundary does not stand in the W N W line, then a course must be shaped in the nearest direction to strike the said W N W line, and then the first and second lines of *Heath's Range* must bind on *Painter's Rest*, as expressed in the certificate. The judgment of the court below ought to be reversed.

JUDGMENT REVERSED.