WILFORD A. COUNCILL *vs.* SUN INSURANCE OFFICE OF LONDON.

*Insurance—Contract for Repairs—Authority of Adjuster—*
*Election by Insurer to Repair—Parol Evidence—*
*Fraudulent Promise.*

On an issue as to whether an adjuster for defendant insurance company, in awarding a contract for the repair of plaintiff's car, which, having been insured in defendant company against theft, had been stolen and injured, acted for the com-

pany, *held* that the evidence justified the inference that he did so act, it not appearing that plaintiff had had anything to do with the award of a contract for repairing the car, nor that he had authorized the adjuster to make a contract in his name.

p. 141

The insurance company, by submitting to plaintiff a proof of loss which was based upon the contract for repairs made by its adjuster, and by its payment of the amount named therein, *held* to have recognized the adjuster's authority to adjust plaintiff's claim.        p. 142

An exception based on the exclusion of a letter cannot be considered on appeal if the letter does not appear in the record.        p. 147

Where an insurance policy gave the insurer the right to elect to "repair, replace or rebuild" the property in case of loss, an adjuster for the insurer, clothed with apparent authority to adjust or settle a claim on the policy, had power to elect to repair.        p. 148

That after plaintiff's car, insured against theft by defendant company, was stolen and recovered in a damaged condition, defendant's adjuster took full charge and possession of it, that he gave the work of repairing it first to one concern and then to another, that plaintiff at no time made any contract himself for the repair of the car, or authorized any other person to do so, or recognized or ratified any contract for its repair, justified the inference that the defendant, through its adjuster, elected to repair the car, as authorized by the policy in case of loss.

p. 148

The rule excluding parol evidence offered to vary, contradict, add to or take from a written instrument does not prevent the introduction of evidence that the execution of the instrument was induced by false or fraudulent statements or promises.

p. 149

A false promise, not intended to be performed, but made to trick and deceive another into the execution of a written instrument, is a fraud, as constituting a misrepresentation of the promisor's state of mind, and may, in an action on the instrument, be shown by any competent evidence, whether oral or documentary.        pp. 150, 151

On an issue as to the validity of a release, given to an insurance company by a policy holder, of all claims by reason of a loss under the policy, *held* that evidence was admissible to show that such release was procured by means of a promise, not intended at the time to be performed, to see that a contract for the repair of the insured article, made by the insurer, was fully performed.            p. 151

*Decided June 20th, 1924.*

Appeal from the Superior Court of Baltimore City (CARROLL T. BOND, J.).

Action by Wilford A. Councill against the Sun Insurance Office of London. From a judgment for defendant, plaintiff appeals. Reversed.

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, and DIGGES, JJ.

*James Morfit Mullen,* for the appellant.

*Francis B. Wiers* and *George Ross Veazey,* with whom were *Haman, Cook, Chesnut & Markell* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an appeal from a judgment on a directed verdict for the defendant in an action of assumpsit in the Superior Court of Baltimore City brought by the appellant against the appellee.

The record presents three exceptions, two of which relate to questions of evidence, and the other to the action of the lower court in granting a prayer at the close of the plaintiff's case instructing the jury that the evidence offered by the plaintiff was not legally sufficient to entitle him to recover, and that, therefore, their verdict must be for the defendant.

Since the defendant's prayer concedes the truth of the evidence offered on behalf of the plaintiff, together with such

inferences as may be legitimately drawn therefrom, the facts of the case are, practically speaking, undisputed, and thus dealt with in substance, they are as follows:

On September 2nd, 1920, the appellant bought from the Woods Motor Company a motor car for $2,580, and financed the purchase through the Finance and Guaranty Company. The appellee had prior to that issued to the Finance and Guaranty Company a policy insuring it against any direct loss or damage occurring through the loss or damage by fire, theft or pilferage of automobiles covered by it. The object of that policy, it may be inferred, was to protect the insured against loss through any of the causes covered by it on automobiles which it owned or on which it had a lien or claim, but under its terms it also inured to the benefit of purchasers of automobiles to whom the Finance and Guaranty Company issued insurance certificates when countersigned by the policy agent of the company. Acting under that authority, that company issued such a certificate of insurance to Dr. Councill, the appellant, for $2,064 on September 2nd, 1920, covering the motor car purchased by him on that date. Between the date of its purchase and February 15th, 1921, the appellant drove the automobile so purchased about four thousand miles, although it was on the day last mentioned in excellent condition. On that day he "parked" it at the corner of Baltimore and Calvert Streets in Baltimore City while he went to a nearby drug store, and when he returned he found that it had been stolen. He promptly made an oral report of his loss to the insurance company, and on February 17th, 1921, he was informed by a Mr. Cowan, an adjuster for that company, that it had been recovered, and that he, Cowan, had had it taken to Woods' garage in Baltimore City, where it then was. When it was recovered the machine was so badly damaged that it was necessary to tow it to the garage, and upon an examination it was found that extensive repairs were necessary to put it in a usable condition. Councill inspected the car, but did nothing himself towards having it repaired, and a few days later Cowan approached him again

and told him that he (Cowan) had received an estimate from
a Mr. Woods of the probable cost of the needed repairs, but
rather discouraged the idea of having the work done by
Woods, and suggested that the Auto Mart Company would
be better equipped for it. Councill made no reply to that
suggestion, and later Cowan returned and said that he had
received an estimate from the Auto Mart Company of $380,
later increased to $430, for repairing the car. Councill him-
self did nothing either in connection with that report, but
Cowan, acting apparently for the insurance company, em-
ployed the Auto Mart Company to do the work. That he
acted for the insurance company in doing that is one of the
controverted points in the case, but assuming the truth of all
the testimony in the case tending to establish that fact, it is in
our judgment sufficient to warrant the inference that in
awarding the contract for repairing the car he was acting
for the insurance company. The appellant, if we accept his
testimony, had had nothing at all to do with awarding any
contract for the repair of the car, nor is there anything in
the record to show that he had at any time authorized Cowan
to make a contract in his name, so that Cowan either made
the contract for himself or for the insurance company, for
he certainly had no authority to make it for Councill.

The appellant in his testimony, in referring to Cowan's
acts in connection with the contract for repairs made with
the Auto Mart Company, said in part: "Did you have any
conversation with Mr. Cowan, the adjuster, with regard to
getting estimates or with regard to getting anybody else to
repair the car? A. I said to Mr. Cowan when he told me
the Auto Mart Company was going to look after my car, I
said, 'Why not get an estimate from the Zell and the Pack-
ard and the Cadillac people?' I knew the Zell people; I was
next door to them. He said the Auto Mart is all right;
every time I get an estimate from these folks they charge me
$5.00 or $10.00 for an estimate; the Auto Mart Company is
all right; they have done work for me before. Q. What did
you tell him with regard to having the car repaired? A. I

did not tell him anything. Q. In any event, he told you he had given the job to the Auto Mart people? A. That is correct. * * * Q. What did he tell you about getting the Auto Mart to repair your car, if anything? A. He told me that the Auto Mart were the people to repair my car; he knew what they could do and he had seen them work, and they did painting work and upholstering work and mechanical work right there at their place, and he said he knew they would fix my car up all right and I need not worry about it at all, that he had given them work before. Q. In the meantime had you said or done anything to lead anybody to believe the car was taken from the Woods Motor Company at your request or suggestion? A. No, sir, * * * Well, after my car had been taken to the Auto Mart by Mr. Cowan or sent there, I went to the Auto Mart to see my car and see what they were going to do—— Q. What did you see on this occasion? Do you know whether it was before or after you saw the estimate? A. After that. Q. Had you seen Mr. Cowan any more in the meantime? A. I saw him after March 12th. Q. Did he say anything who was doing the work? A. He had already told me he had given the work to the Auto Mart, the Auto Mart had made an estimate on it and he showed me a bill received from the Auto Mart. Q. Had you made any arrangements yourself with the Auto Mart or with anybody with regard to having your car repaired further than what you have testified to as to what Mr. Cowan said to you? A. No, sir." For as much as the proof of loss which the insurance company afterwards submitted to Councill was based upon the contract which Cowan had made with the Auto Mart Company, the insurance company, by that act, and by its payment of the amount named therein, to which we will presently refer, recognized Cowan as its agent authorized to adjust the appellant's claim against it.

After the repair work had been started, Cowan, acting for the insurance company, wrote to Councill telling him what the estimated cost of the repairs would be and asking him to submit proofs of loss for that amount, together with the

expense of towing the car in, which the Woods Motor Company had charged against Cowan.   Upon receiving that letter Councill went to the garage and found that the repairs covered by the estimate would not place the car in good condition, and he also desired to be reimbursed for the loss of the tires which had been damaged when the car was stolen. The estimate of his loss was then increased to $530, but he hesitated to sign proofs of loss for that amount because at that time the repairs had not been completed, and before he did sign them the Auto Mart Company's representatives brought the car to him and asked him for a check for the work done on it, although the repairs were not then completed.   He told them that he had nothing to do with the contract for repairs and they then went with him to see Cowan, who told him that it was true that the Auto Mart Company wanted its money and that he, Councill, would have to sign a proof of loss.   That later Cowan brought him a proof of loss in which his loss was placed at $530, and he signed it.   Some time after he signed it, he was notified that a draft for that amount had been received by the Finance & Guaranty Company, from which he had borrowed the money to buy the car and to which he was still indebted, and requested to call at its office and endorse it.   At that time, however, the work on the car was not progressing satisfactorily, and the appellant doubted whether he ought to sign the draft, but he finally did sign it under the circumstances described in the following extracts from his testimony: "That he refused to sign that draft because his car had not been fixed, and that when that letter was written to come down and sign the draft, he had been down to see Mr. Fisher and talked to Mr. Cowan and told them he would not sign the draft until his car was fixed.   He had several interviews with them; that he had made a demand on the Auto Mart and had written them a letter, copy of which witness then produced, the same being letter signed by witness dated May 28, 1921. * * * That up to that time his car had not been fixed; that hardly anything had been done.   The knock was still in the motor, running-board had one color brown

and the other was green, his fender and his upholstery and his tools, none of these things had been completed, fixed or touched at the date of the letter referred to. * * * That on May 28, 1921, he made a written demand upon the Auto Mart to have his car fixed; that a carbon copy of a letter that he wrote the Finance and Guaranty Company on June 12, 1921, enables him to fix the date of the interview concerning which he and Dr. Detrick had testified as after June 12th. That at the time he signed the draft in evidence, his car had not been fixed. Q. State your recollection of what took place at this interview at which you and Dr. Dietrich and Mr. Cowan and Mr. Fisher were present? A. Mr. Fisher said, 'Mr. Cowan, can we not have this thing fixed up for Dr. Councill if he signs the draft?' he said, 'We can get the car——' (The Court): Who said that? A. Mr. Cowan said, 'Yes, if Dr. Councill signs the draft we can get the car'; I was kind of dubious about signing the draft, I had not signed it for six weeks before, it had been six weeks since I had been notified about the draft—— Q. You had not signed the draft? A. No; I started to talk with Mr. Fisher and he said, 'The only thing you can do * * * is to sign the draft'; so in the presence of Mr. Cowan and Mr. Fisher after this assurance they would get my car from the Auto Mart and fix it up—— (The Court): Who said that? A. In the presence of Mr. Cowan and Mr. Fisher both said if I signed the draft I could get my car. (The Court): Who said they would fix the car? A. Mr. Cowan and Mr. Fisher. Q. Which one said it? A. They were talking there together; Mr. Cowan said it, the only way we can get the car is for Dr. Councill to sign the draft, the Auto Mart would not release it—— Q. (Mr. Mullen): Both said it? A. Both of them, if I would sign the draft. Q. What part did Mr. Cowan have in connection with any promise to see that the car was fixed up if he had any connection? A. Mr. Cowan was really the real man who told me, he said, 'The only way to get the car you will have to sign the draft before you get the car,' and Mr. Fisher said, 'Doctor, that is the only thing you can do, if you sign the draft Mr. Cowan can get the

car'—he did not say Mr. Cowan—he said, 'We can get the car and have it fixed up for you then, and that is the only way to get the car, the Auto Mart will not give it to you.' "

The Fisher referred to in this testimony appears to have been a policy writing agent of the insurance company and in some undisclosed way to have been connected with the Finance & Guaranty Company, and the draft, after Councill had endorsed it, was left with him for that company and by it endorsed to the Auto Mart Company. Although it had been paid $100 more than its estimate, that company failed to properly repair the machine and Cowan finally took it out of its hands and employed Fred S. Orn to complete the repairs. He did work on it which he valued at $418, and finally sent a bill for that amount to Councill, who refused to pay it because he had never employed Orn and had never authorized any one else to employ him. Orn then sold the car for his bill, and notified Councill that, after deducting from the proceeds of the sale his repair bill, storage, insurance, and other incidental expenses, together aggregating $589.75, there was a balance of $19.25, which he was ready to pay to Councill or to Cowan on the request of both. Councill, however, declined to accept that amount, but demanded that the insurance company reimburse him for the loss he had sustained through its failure to repair his motor car. That company, however, very courteously but very firmly, disclaimed any further responsibility, and in consequence the appellant instituted this suit to recover the loss which he claimed to have sustained through the appellee's failure to make such repairs.

Briefly re-stated, free from obscuring detail, the essential facts are these: The appellant was insured by the appellee against the loss of his motor car by theft. It was stolen and recovered in a badly damaged condition. The insurance company took possesion of the machine and made a contract with the Auto Mart Company to have it repaired. Before it was repaired they induced the appellant to sign a proof of loss, to accept a draft, and to sign a release, by promising that if he did accept the draft and sign the release it would

see that the car was repaired. The draft and release referred to were in the following form:

> "At sight pay to the order of Dr. W. A. Councill and Finance & Guaranty Co. five hundred thirty and no/100 dollars, being in full for all demands and in release of all ·claims or rights of action against said company for loss or damage by theft on the 15th day of Feby., '21, to property insured under Policy No. 45392-Ctf. 1191 of New York City. * * *

> "Received of the Sun Insurance Office of London by sight draft the sum of five hundred thirty and no/100 dollars—$530.00—being in full satisfaction of all claims for loss or damage by theft on the 15th day of Feby., '21, under Policy No. 45392-Ctf. 1191 of the Sun Insurance Office, issued at the New York City agency of the said company, and in consideration of said payment the said company is hereby released and discharged forever from all further claims by reason of said theft and the said policy is hereby reduced in amount of $530.00. Receipts are signed in duplicate."

After the draft and release had been signed the appellee took the car from the Auto Mart, which had already been paid by the draft for repairing it, and employed Orn to complete the repairs. When he did so it failed to pay him and the car was sold to pay the bill.

In connection with these facts the following provisions of the policy referring to the rights and privileges of the company in the event of a loss must be considered:

> "It shall be optional with this company to take all or any part of the property at such ascertained or appraised value and also to repair, rebuild or replace the property lost or damaged with other of like kind and quality within a reasonable time, on giving notice within thirty days after the receipt of sworn statement of loss herein required of its intention so to do; but there can be no abandonment to this company of the property described."

The plaintiff declared on the six common counts in assumpsit, and one special count on the defendant's alleged contract to repair, and he subsequently filed an additional special count, whereupon the defendant demurred to each count of the amended *narr.* While it does not appear that the court acted on that demurrer, the subsequent proceedings indicate that it was overruled. Since the propriety of that ruling was not questioned in this Court, it is sufficient to say that, in our opinion, the several counts in the declaration each sufficiently states a cause of action and we fully concur in the ruling of the lower court on the demurrer.

This brings us to the exceptions. The first relates to the exclusion of a letter written by plaintiff's counsel to the appellee, but as the letter does not appear in the record it is impossible for us to say whether the appellant was injured by that ruling, or to assume that it was erroneous.

The second exception, which was taken to the action of the lower court in striking out all testimony relating to the appellee's contract to repair the appellant's automobile, may be considered in connection with the third, which relates to the court's action in granting the defendant's prayer to take the case from the jury on the ground that there was no evidence in the case legally sufficient to entitle the plaintiff to recover.

In support of those rulings the appellee submits these propositions: (1) that parol evidence was inadmissible to show that when the plaintiff signed the draft and release the appellee undertook in addition to paying the $530 to repair the automobile, (2) that there was no evidence in the case legally sufficient to show that the appellee had at any time elected to repair the car, and (3) that such an election was not within the scope of the policy and that therefore Cowan as a mere agent for adjustment had no power to bind the company by such an election. For convenience we will deal with these questions in inverse order.

As already pointed out, the policy itself gave the appellee the right to elect to "repair, replace or rebuild" the property lost, and without further elaboration that is a sufficient

answer to the contention that such an election was not within the scope of the policy. Cowan was an adjuster for the company, clothed with apparent authority to adjust or settle the plaintiff's claim, and as an election to repair was one form of settlement or adjustment reserved to the insurance company by the policy, he had the power to make such an election.

Nor does the contention that there is no evidence in the case legally sufficient to show that the insurance company did elect to repair the car present any difficulty. The letter of the insurance company, upon which some reliance seems to be placed, is in some respects in conflict with other testimony as to whether an election was in fact made by the company, but that conflict is a question for the jury and not for the court. *Consol. Rys.* v. *Pierce,* 89 Md. 495. The evidence shows that after the car was stolen Cowan, the company's agent, took full charge and possession of it, that he gave the work of repairing it to the Auto Mart Company, and that he afterwards took it from that company and employed Orn to complete the repairs, and too that the appellant at no time either made any contract himself for the repair of the car, or authorized any one else to do so for him, or recognized or ratified any contract for its repair. Certainly from those facts it may be inferred that Cowan as the insurance company's agent elected to repair the car instead of paying Councill in money for his loss. Whether these facts are so, we do not of course decide, since we only deal with them in connection with a prayer which concedes them. Whether the clause in the policy allowing the company to make such election was made for its benefit as appellee contends, or for the benefit of the insured, is wholly immaterial since the inquiry here is directed not to the reason for the power but to its existence.

This brings us to the proposition that parol evidence was inadmissible to show that when the appellant signed the receipt and release and endorsed the draft the insurance company agreed to repair the automobile in addition to paying the $530. Strictly speaking that proposition does not pre-

sent the legal question arising from the facts adverted to, because the evidence was not offered to show that the promise was to repair in addition to paying the $530, but rather an undertaking to see that the contract made by the company for the repair of the motor car for which the money was paid was fully performed. At the time the draft was given the insurance company was indebted to the Auto Mart Company under the repair contract it had made with it, and it was interested in seeing that the draft was applied to the payment of that indebtedness. So far as Councill was concerned, however, the Auto Mart Company was paid for work to be done in the future, under a contract to which he was not a party, and he was interested in seeing that the insurance company compelled its performance. And the evidence was offered not to show that the company agreed to pay $530 and repair the car, but that it agreed to see that the car was repaired for the $530.

No rule is more firmly established or more generally recognized than that which excludes parol evidence offered to vary, contradict, add to or take from a written instrument. But in our opinion that rule, in cases where the execution of a written instrument has been induced by false or fraudulent statements or promises, does not prevent the introduction of evidence showing such facts in any action on the instrument, because such evidence is not offered to vary or to contradict the instrument but to destroy it, and cases dealing with evidence which, while conceding the validity of such an instrument, nevertheless is offered to contradict or vary it, are parallel to the question.

The evidence in this case is that when the release and receipt were signed the repairs to the car which constituted the real consideration for the release were not completed, and that to induce him to sign the release and receipt and to accept the draft the company agreed to see that the repairs were completed. That is, the draft was not a money settlement of Councill's loss, but in payment of an indebtedness under a contract for the repair of his car, which the insur-

ance company itself had made, and which it undertook to see performed.

It may be inferred from the evidence that at the time it made that promise it never intended to perform it, but made it merely to induce the appellant to execute the release. Whether under such circumstances that promise amounted to a fraud is a question upon which there is much confusion and conflict in the authorities, but in our opinion reason and justice, as well as the trend of the best considered cases, support the proposition that a false promise, not intended to be performed, but made to trick and deceive another into the execution of a written instrument, is a fraud, and may in any action on the instrument be shown by any competent evidence, whether oral or documentary. It is true that in a sense a promise to do some act or refrain from some act in the future may establish a merely contractual relation, but where it is made with a fraudulent design to induce the promisee to do something he would not otherwise have done, it is more than that, it is a misrepresentation of the promisor's state of mind, which may be, and in a case such as that before us is, a very material thing. The insurance company had made the contract for repairs, but that contract had not been completed. It was in a position to compel its completion if it wished to do so. Whether it was willing to do so was therefore a material fact. In dealing with a somewhat similar question Bowen, L. J., in *Edgington* v. *Fitzmaurice,* 29 Ch. Div. 483, said: "But when we come to the third alleged misstatement I feel that the plaintiff's case is made out. I mean the statement of the objects for which the money was to be raised. These were stated to be to complete the alterations and additions to the buildings, to purchase horses and vans, and to develop the supply of fish. A mere suggestion of possible purposes to which a portion of the money might be applied would not have formed a basis for an action of deceit. There must be a misstatement of an existing fact; but the state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it

can be ascertained it is as much a fact as anything else. A misrepresentation as to the state of a man's mind is, therefore, a misstatement of fact." And in *Willston on Contracts,* par. 1496, that learned and careful author says: "It is frequently said that a promissory statement cannot be the basis of an action for deceit; and a prediction of future events is at best a statement of opinion. It is undoubtedly true that failure to perform a promise cannot amount to fraud. And in many jurisdictions, without consideration of the question whether a promise was made with an intention not to perform it, it is held that the making of the promise cannot be an actionable fraud. It has been pointed out, however, that when a promise is made with intention not to perform it, the promisor is guilty of misrepresentation. And in a number of cases, generally of recent date, the doctrine seems broadly accepted that a promise which the promisor does not intend to carry out may be a misstatement of material fact." In a very exhaustive note to *Cerny* v. *Paxton & G. Co.,* 10 L. R. A. N. S. 646, in connection with the authorities referred to, the annotator says: "The position taken in *Cerny* v. *Paxton & G. Co.* that an apparent exception to the general rule is that, if the intention not to perform exists when the promise is made, the promise is fraudulent, has strong support in the authorities; but the courts are divided on that question, some refusing to make any exceptions to the rule." And the position thus stated is in principle we think supported by the decisions of this Court. *Price* v. *Read,* 2 H. & G. 291; *Adams* v. *Anderson,* 4 H. & J. 458. And without going to the extent of holding that as a general rule a contemporary parol agreement to do or give something in addition to the consideration named in a written contract may be shown, in our opinion where such an agreement was made in the execution of a design to induce the execution of the written agreement by parol promises not intended to be performed, it may be shown by oral testimony as evidence of fraud, for to hold that under such circumstances such evidence was not admissible would be to subvert a rule of law intended to prevent fraud into a device to promote it.

It follows from what we have said that there was error in striking out the evidence of the oral contemporaneous agreement, and also in granting the defendant's prayer, and that because of these errors the judgment appealed from must be reversed.

*Judgment reversed, with costs to the appellant, and case remanded for a new trial.*