# WILLIAM M. LIPP *v.* LOUISA P. LIPP.
[No. 52, October Term, 1929.]

208

*Decided January 9th, 1930.*

The cause was submitted on briefs to BOND, C. J., PATTI-SON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Edwin H. Brownley, William Saxon,* and *Derlin Mc-Kindless,* for the appellant.

*R. Edgar Tippett* and *George O. Bloome,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal are mother and son. On September 15th, 1919, Louisa P. Lipp, the appellee, conveyed to William M. Lipp, the appellant, a leasehold property known as 544 East Clement Street in Baltimore City, which had been conveyed to her and her husband, John C. Lipp, as tenants by the entireties, on August 8th, 1899, and which they occupied until his death, which occurred in or about 1917. After his death Mrs. Lipp continued to reside there with her son, the appellant, until she conveyed it to him in 1919, and thereafter until January 24th, 1927, when she was "moved out" of it by him. Following that action on his part, on the 18th of July, 1928, she filed in the Circuit Court of Baltimore City a bill of complaint against him and Margaret R. Lipp, his wife, in which she asked (1) that the defendants be enjoined from selling or encumbering the property which she had conveyed to him, (2) that her deed conveying it to him be set aside, and (3) that she be granted

general relief. A demurrer to that bill was sustained, as was a demurrer to an amended bill of complaint which she filed on November 20th, 1928, and on March 19th, 1929, she filed a third bill entitled "Second Amended Bill of Complaint", praying process against William M. Lipp alone, in which, in addition to the relief prayed in her original bill, she asked that "a money decree for the reasonable value of the furniture and other household effects retained by the defendant, William M. Lipp, in said property, 544 East Clement Street, or that said defendant by decree of this honorable court be directed to surrender up and deliver unto your oratrix said furniture and household effects."

The defendant demurred severally to each paragraph of that bill, and to the whole bill, on the grounds (1) that the court was without jurisdiction, (2) that the "plaintiff" was "without equity," (3) that the "statements of facts" mentioned in the bill were "vague, uncertain and indefinite," (4) that the complainant had a full adequate and complete remedy at law, (5) that she had not stated such a case as entitled "him" to relief in equity, and (6) that it was "bad in substance, defective in law, insufficient in facts, and defective in equity to constitute a valid cause of action in equity." The court by its decree of May 2nd, 1929, overruled the demurrer, and from that decree this appeal was taken by the defendant.

In addition to the facts thus stated, it is alleged in the bill that Mrs. Lipp for a long period of time suffered from cancer, and was informed by her physician that she could not live for six months unless she submitted to an operation; that the operation might cause her "immediate death," but on the other hand if successful might prolong her life for two or three years; that she did undergo the operation, and in consequence partially regained her health, and returned to live with her son, William M. Lipp, at her home; that, to quote from the bill, "for a long period of time prior to the said transfer, and during the time of your oratrix's illness, the said defendant, William M. Lipp, constantly requested, insisted, importuned and in every way urged your oratrix to

transfer her property, 544 East Clement Street, to him. That your oratrix finally yielded to the constant and urgent importunities of the defendant, William M. Lipp, to convey to him the leasehold property hereinbefore referred to, and accordingly your oratrix did on the 15th day of September, 1919, convey her leasehold interest in said property, to the defendant, William M. Lipp, with the distinct understanding, however, with said defendant, that your oratrix should have the right to live in said property as her home for the residue of her natural life, and the defendant, William M. Lipp, agreed with your oratrix that she should have a home with him in said property as long as she lived, and that he would continue to treat her with the same filial love and affection as he had theretofore manifested toward her, and that he would maintain and support her, for the rest of her life, at his own cost and expense; that thereafter your oratrix continued to live with her said son, William M. Lipp, in her said home, 544 East Clement Street, until the early part of February, 1927."

It is further stated that she "maintained and supported" the appellant from the time of his birth until February, 1927, and that up to that time she paid all taxes and public dues assessed against the property which she had conveyed to him. That for a number of years prior to the conveyance to appellant, she had conducted a store in the property and that from the profits of that business she had "raised" a family of six children, of which "the defendant" was the youngest, and that she continued to conduct that business for some seven or eight years after she had conveyed the leasehold to the defendant, and that during that period she employed him on a salary, and gave him "room and board without charge or payment." That for a long time prior to the conveyance to him, and for eight years thereafter, she and the appellant lived together in their home happily and peacefully, she "furnishing the table and paying all of the other expenses incidental to running" it. That in December, 1926, she sold the business to William for $2,000 and on January 24th, 1927, he married, and, to further quote from the bill, "in

February of that year brought his wife and his mother-in-law to the home of your oratrix, 544 East Clement Street, to live, whereupon the defendant, William M. Lipp, gave your oratrix's bedroom to his mother-in-law, and moved your oratrix out of the property, taking her to the home of one of her married daughters and leaving her there with the statement: 'You have done enough for your other children; now let them take care of you.' That your oratrix avers that since she was moved out of her said home, 544 East Clement Street, by the defendant, William M. Lipp, she has been compelled to make her home with her married daughters, living on their charity, affection and kindness, and but for this fact she would be without home and means of support. That the defendant, William M. Lipp, has refused and continues to refuse to permit your oratrix to make her home with him in violation and repudiation of the distinct understanding had between your oratrix and the defendant, William M. Lipp, that your oratrix should have a home with him in said property, 544 East Clement Street, and that he would maintain and support her and provide her with a comfortable, quiet and peaceful home." That since "ejecting" complainant from her home, appellant has appropriated to his own use certain "household effects" and furniture belonging to her, and refuses to permit her to "have or use" them. And "that your oratrix is now seventy-one years of age, in feeble health, unable to maintain and support herself or to provide herself with a home, and your oratrix charges that she would be homeless but for the kindness and generosity of her married daughters."

The truth of these allegations is conceded by the demurrer, and the question presented by the appeal is whether they are sufficient to entitle the appellee to the relief prayed.

Appellee's theory in respect to the primary relief prayed appears to be that the circumstances under which the appellant acquired the leasehold property were such that a court of equity will raise and enforce a constructive trust in favor of the grantor for the uses and benefits inuring to her under

the agreement between her and appellant, which induced her to convey the property to him.

Appellant's contention is that the agreement was collateral to, and independent of, the conveyance, that the doctrine of constructive trusts has no application to the facts stated in the bill, that consequently a court of equity is without jurisdiction to grant the relief prayed, and that for any breach of the contract appellee must seek her remedy in a court of law, which can afford full, adequate and complete relief. The controlling issue in the case, therefore, is whether the facts stated are sufficient to establish a *prima facie* presumption that appellant holds the property involved under a constructive trust for the uses and benefits accruing to the appellee under the alleged oral agreement which she contends induced her to convey it to him.

The doctrine of constructive trusts has, in recent years, been considered by this court in several cases involving facts not wholly unlike those involved here. In *Flanagan v. Flanagan,* 133 Md. 332, one of the earlier cases, Rachel Flanagan had granted her life interest in certain leasehold property to her son, who supported and maintained her at his home until his death. At his death his widow administered on his estate and sold the property at public sale. Mrs. Rachel Flanagan then filed a bill to restrain the administratrix from conveying the property to the purchaser, and also to set aside the deed conveying it to Charles Lee Flanagan, who had been the son of the complainant, and the husband of the administratrix, on the ground that the real consideration for the conveyance was the son's promise to support her and furnish her with a home for the remainder of her life. In that case the court, after announcing the conventional and settled legal principles which exclude evidence of antecedent and contemporaneous parol agreements to vary, contradict, or impeach a deed or the consideration stated therein, in the absence of fraud, incapacity, or undue influence, added this: "There are cases where it is held that, where a grantor conveys property and the consideration is an agreement by

the grantee to support, maintain and care for the grantor during his or her natural life, and the grantee neglects or refuses to comply with the contract, a court of equity will rescind the contract, strike down the deed and decree a reconveyance of the property. The decisions will be found upon examination to be based upon the theory that the neglect, failure or refusal of the grantee to comply with the contract, raises a presumption that the contract was fraudulent in its inception, and he will not be permitted to enjoy the possession of property so obtained." And it decided the case and affirmed the decree dismissing the bill for the expressed reason that, as the son had supported the grantor and furnished her with a home during his life, he had so far complied with his contract as to preclude any inference that in procuring the deed he had acted fraudulently. While, therefore, in that case the court did not expressly adopt the principles to which we have referred, there is nothing either in its conclusion or its language to indicate that it disapproved them.

The question came up again in *Springer v. Springer,* 144 Md. 465. The essential facts of that case were these: The Reverend Thomas L. Springer, a Presbyterian minister, being at the time in somewhat straitened circumstances, to secure a home for himself and family bought a leasehold property in the City of Baltimore, and practically all of the family resources were exhausted in making the initial cash payment. He later bought the reversion and in both instances he had the title placed in the name of his son, James L. Springer. At the time he purchased the leasehold, Thomas L. Springer feared he would have to undergo an operation for cataract, and that he might become incapacitated, and felt that the title to the property should be in some one who would be better able to deal with any questions that might arise in connection with it than he or Mrs. Springer, his wife, and for that reason he had the title put in the name of James L. Springer, his son, but upon the understanding that he would convey it to his father if his health improved so that he could manage it. Subsequently James repudiated that

understanding and asserted an absolute title to the property, whereupon Thomas L. Springer filed a bill against him to compel him to convey the property to him, Thomas L. Springer. Upon those facts the court held that James held as constructive trustee for his father, and announced and accepted this statement of the law of constructive trusts applicable to such facts: "A satisfactory general definition of such trusts is to be found in 26 *R. C. L.,* page 1232, where it is said: 'Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it.' * * * And to the same effect is the following statement in *Coyne v. Supreme Conclave,* 106 Md. 54. 'There is also a class of trusts which arise *ex maleficio,* and equity in order to reach the possessor of what in conscience belongs to another turns him into a trustee.' The 'fraud' referred to in these definitions need not be actual, but may be constructive, and one 'who acquires land or other property by fraud, misrepresentation, imposition, concealment, or under any other such circumstances as render it inequitable for him to retain it, is in equity regarded as the trustee of the party who suffers by reason of the fraud or other wrong and who is equitably entitled to the property.' And a violation of a parol agreement to hold property in trust for another may, under certain circumstances, be sufficient evidence of fraud to raise a trust in favor of the promisee (39 *Cyc.* 178), and such an agreement may be inferred from the acts and conduct of the parties, as well as from their spoken words. *Mead v. Robertson,* 131 Mo. App. 185; *Crossman v. Keister,* 223 Ill. 69, 8 L. R. A. (N. S.), 707. As where a grantee, knowing from the statements and conduct of the grantor that the grant is upon trusts which the grantor believes he will carry out, accepts the grant under circumstances which to his knowledge justify such a belief. *Ibid.* 4 *Ves.* 10; *Suman v. Harvey,* 114 Md. 255, 256; *Ruhe v. Ruhe,* 113 Md. 601; *Clark v. Clark,* 139 Md. 42."

In *Jasinski v. Stankowski,* 145 Md. 58, where the proof showed that the property was conveyed to the defendant under a parol agreement to hold it for an equal division among the children of Joseph and Kazimiera Jasinski, the court, after quoting with approval the statement in *Coyne v. Supreme Conclave,* 106 Md. 57, that "There is also a class of trusts which arise *ex maleficio,* and equity, in order to reach the possessor of what in conscience belongs to another, turns him into a trustee. 'Thus, if a man in confidence of the parol promise to another to perform an intended act, should omit to make certain provisions, gifts or arrangements, by will, or otherwise, such a promise would be specifically enforced in equity, although founded on a parol declaration creating a trust contrary to the Statute of Frauds, for it would be a fraud upon all other parties to permit him to derive a benefit from his own breach of duty and obligation.' *Story, Eq. Juris.,* sec. 781 (13th Ed.)," affirmed *Springer v. Springer* and added this: "In the course of a full note in 39 *L. R. A.* (N. S.) 911, summarizing cases which involve questions analgous to the one here presented, it is said: 'To avoid the injustice arising from the repudiation of a parol trust, courts of equity have frequently seized upon the slightest circumstances connected with the procurement of the conveyance to avoid the operation of the Statute of Frauds,' and 'Perhaps the most satisfactory inference of a fraudulent intent on the part of a grantee is to be derived from his activity in procuring the conveyance; and in the instances hereinafter detailed in which equity has compelled the performance of the promise, it will be found that the grantee made some representation or otherwise took an active part in inducing the grantor to convey.' "

In *Dillfelder v. Winterling,* 150 Md. 626, upon a showing that plaintiff while ill conveyed property to her daughter upon the latter's frequent requests and her promise to reconvey it on demand, and that the daughter later repudiated her promise and refused to convey, the court again, after a very careful survey and analysis of the cases in an opinion filed

by Judge Pattison, affirmed the conclusions reached in these earlier cases.

In *McIntyre v. Smith,* 154 Md. 672, although it affirmed these earlier cases, attention was called to the fact that, where fraud is relied on as the ground for declaring a constructive trust, the fraud must have been perpetrated at the inception of the transaction, or at least have accompanied it. For it is well settled that the mere breach of a parol promise or contract, untainted by fraud, will not be sufficient to raise such a trust, even though the conveyance of the property, in respect to which the trust is charged, was induced by such promise or contract. 35 *A. L. R.* 288. But while that is true, it is also true that the subsequent conduct of the grantee may be of such a character as to warrant the inference that, at the time he made the promise, he never intended to perform it, and may be treated as tending to show that in procuring the conveyance the grantee acted with a fraudulent intent, for his state of mind would under such circumstances be a relevant fact. *Councill v. Sun Ins. Office,* 146 Md. 150; *Brock v. Brock,* 90 Ala. 86, 9 L. R. A. 287.

In 35 *A. L. R.* 288, the editor states that "there is considerable difference of opinion as to whether a fraudulent intent on the part of the grantee may be inferred from any given set of circumstances. To avoid the injustice arising from the repudiation of a parol trust, courts of equity have frequently seized upon the slightest circumstances connected with the procurement of the conveyance to avoid the operation of the Statute of Frauds; and have even gone to the extent of inferring a fraudulent intent from the grantee's failure or refusal to perform the alleged agreement." But, as the author subsequently points out, the conclusion that the mere failure to perform a contemporaneous parol agreement, which operated as an inducement for the execution of a grant or conveyance, will in itself justify an inference of fraud, is contrary to the weight of authority. 45 *A. L. R.* 853, 35 *A. L. R.* 288. And while that proposition appears to be gaining some recognition, in our judgment it is in

conflict with legal principles long settled in this state, which we are unwilling to disturb.

In valuing facts relating to the question before us, courts have frequently stressed the importance and significance of the situation of the parties, the relations existing between them, the activity of the grantee in procuring the conveyance, and in some cases the refusal of the grantee to carry out a promise upon which the grantor relied, have been given weight as indicating a fraudulent intent in procuring the conveyance. *Foster v. Dwire,* 51 N. D. 581, 51 A. L. R. 21; *Rogers v. Harris,* 76 Okla. 215. But while the failure of the grantee to perform his promise may, under some circumstances, in connection with other facts, be given some weight in determining his original intent, as we have already indicated, it alone can never support an inference that the grantee made the promise with a fraudulent intent. For if his mere refusal to perform his promise were given that effect, every breach of contract would be sufficient to raise a *prima facie* presumption that the contract was conceived and executed in fraud, and the general recognition of that principle would nullify the Statute of Frauds. The danger of pushing the exception to the general rule that fraud cannot be predicated on "unfulfilled promises or statements of future events" too far is abundantly illustrated in a very useful and exhaustive note in 51 *A. L. R.* 49.

Turning to the immediate question, it may be said that appellant's criticism that the bill of complaint is "vague, uncertain and indefinite" is reasonably justified. It contains many facts that are wholly irrelevant, and omits others which it should contain. Nevertheless it does contain allegations of fact which, with their natural inferences, may be thus summarized in narrative form:

For many years prior to 1917, Louisa P. Lipp and John C. Lipp lived in the leasehold property 544 East Clement Street, which they owned as tenants by the entireties, and in which she conducted a store. Upon her husband's death, the title to that property devolved upon her as the sole owner,

and she continued to live there with William M. Lipp, her son, and she also continued to conduct the store until 1926, when she sold the business to him for $2,000. In 1919 she was about sixty-one years of age and had for some years suffered from cancer. She had been informed that without an operation she could not live more than six months, but that an operation might cause her immediate death, or it might prolong her life for two or three years. During her illness, and whilst she was in the state of mind natural under such circumstances, her son, the appellant in this case, "constantly requested, insisted, importuned and in every way urged her" to transfer her property to him. She finally yielded to his "constant and urgent importunities," and did on September 19th of that year convey her leasehold interest in it to him, but upon the "distinct understanding" with him, that she should have the right to live in it as her home for the residue of her natural life, that she should have a home with him as long as she lived, that he would continue to treat her with the same filial love and affection as he had theretofore manifested towards her, and that he would maintain and support her for the rest of her life at his expense. But, after the execution of that conveyance, not only did he fail to support her, but she maintained and supported him, and paid all taxes and public charges assessed against the property until 1927. Until 1926 she used the property as her home, operated the store in it, and employed William on a salary to conduct the business. He bought out the store business in December, 1926; in January, 1927, he was married, and in February, 1927, he evicted his mother from the property which until then she had used and occupied as her home, and appropriated to his own use her furniture and household effects which were in it at the time.

These facts are the direct converse of those in the case of *Flannagan v. Flannagan, supra,* where it was held that the failure of the grantee to perform his promise to support the grantor during her life could not be considered as an index of fraud, because he had carried out his contract until

his death, and where it was intimated that a different conclusion might have been reached had Flannagan refused or neglected to carry it out. In this case, upon the allegations of the bill, not only did Lipp neglect to support and maintain the grantor as he had agreed to do, but within a very short time after he had gotten possession of the store business he evicted her from the property, although at that time she was seventy-one years of age, in feeble health, unable to support herself, and would have been homeless but for the kindness of her daughters. Whether those allegations are in fact true or false is of course not in issue here, but, assuming them to be true, as the demurrer requires us to do, they are in our opinion sufficient to support the inference that, when the appellant entered into the agreement by which he induced the appellee to convey her property to him, he never intended. to perform it, but used it as a mere bait to entice her into parting with her property.

That a court of equity has, under such circumstances, the power to relieve the appellee from the fraud thus perpetrated upon her, by turning the appellant into a trustee *ex maleficio* of the property for her benefit, and directing a reconveyance of it to her, appears to be well settled, not only by the decisions of this court to which we have referred, but by the general weight of authority. *Century Digest; 1st,. 2nd & 3rd Decennial Digests*—Trusts—Constructive Trusts,. Key No. 91. We therefore concur in so much of the decree of the learned chancellor as dealt with the demurrer to that part of the bill which referred to that question.

Appellant has suggested that the bill fails to show that he still holds the title to the property, but that objection is without substance. It is alleged that the property was actually conveyed to him, and that, in connection with the other allegations of the bill, is sufficient to justify the conclusion that he still holds it. Nor for the reasons already stated is there any force in the objection that the appellee has an adequate remedy at law.

But the demurrer goes not only to the whole bill, but to.

each paragraph of it, and the eleventh paragraph thereof charges that the appellant converted to his own use certain chattels therein described owned by the appellee, and in her third prayer for relief she asks to have a money decree for the reasonable value of those chattels, or to have the appellant directed to restore them to her possession. That demand relates to acts and rights wholly independent of and distinct from those involved in the conveyance of the leasehold property, and if a court of equity had jurisdiction to grant the relief prayed, the whole bill would be bad for multifariousness. *Whittaker v. Coudon,* 130 Md. 243. But we know of no principle of equity jurisdiction which could possibly be invoked to grant the relief asked in that prayer, and the demurrer to so much of the bill as deals with that demand should have been sustained. *Miller's Eq. Proc.* 138; *Fletcher, Eq. Pl.* 208; *Story Eq. Pl.* 473. It will therefore be necessary to reverse the decree in so far as it overruled the demurrer to that paragraph of the bill.

> *Decree affirmed in part and reversed in part, and cause remanded for further proceedings in conformity with the views expressed in the opinion, the costs in this court to be paid by the appellant.*

PARKE, J., dissents