TUFTS ET AL. *v.* POORE ET AL.

[No. 99, September Term, 1958.]

4

*Decided January 23, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT and HORNEY, JJ.

*James A. Crooks,* with whom were *J. Douglas Bradshaw, William A. Linthicum, Jr.,* and *Bradshaw, Shearin, Redding & Thomas* on the brief, for the appellants.

*Lansdale G. Sasscer, Jr.,* with whom were *Jerrold V. Powers* and *Sasscer, Clagett & Powers* on the brief, for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal by the defendants below, Nancy Narcissa Poore Tufts, individually and as executrix of the estate of Pearl Payseur Poore, and William O. Tufts, from a determination by the Circuit Court for Prince George's County,

upon a verdict of the jury, that the codicil of Pearl Payseur Poore, dated July 3, 1955, was procured by fraud. The proceeding arose upon a *caveat* instituted in the Orphans' Court of Prince George's County by the plaintiffs, James Edward Poore, III, Gerald G. Poore, Walter H. Poore, Elizabeth Gilbert Poore, individually and as mother and next friend to Richard T. Poore, Suzanne P. Poore and Thomas W. Poore, infants. Said Orphans' Court transmitted for trial the following issue:

"Was the said paper writing dated July 3, 1955, purporting to be a codicil to the last will and testament of the said Pearl Payseur Poore procured by fraud exercised and practiced upon her?"

The jury by their verdict answered "Yes." There was also an issue upon the question of undue influence to which the jury answered "No," but it is not involved in this appeal, except insofar as it relates to the admissibility of certain testimony.

Sometime prior to 1939, the testatrix, Pearl Payseur Poore, and her husband, Colonel James Edward Poore, Sr., acquired about fourteen acres of land on the banks of the Potomac River in Prince George's County, Maryland. After Colonel Poore, Sr., was retired from military service, he and his wife built a home on the property and made their residence there. The home was built in 1939 and is known as Tulip Hill. The testatrix and her husband had two children, Colonel James Edward Poore, Jr., and Nancy Poore Tufts. Colonel Poore, Jr., married Elizabeth Gilbert Poore in 1927. Six children were born of the union, all of whom were plaintiffs herein. Nancy Poore Tufts married William O. Tufts in 1941. The Tufts have no children.

Mrs. Tufts lived at Tulip Hill with her parents until her marriage in 1941. She and her husband returned to Tulip Hill about 1942, and have continuously resided there since that time.

Colonel Poore, Jr., and his family lived during this period at various Army posts throughout the world, until he was retired from active service for a partial physical disability. He and his family then took up residence in South Carolina.

During the 1940's Colonel Poore, Jr., and his family visited from time to time at Tulip Hill, and Pearl Payseur Poore occasionally visited her son's family in South Carolina. After her husband's death in 1947, Pearl Payseur Poore executed her last will and testament under date of August 2, 1948. This will was drawn with the legal assistance of the Army's Judge Advocate General's Department, and the validity of this document is not questioned in this action. The pertinent dispositive provisions of the will, as stated by the parties, were:

1. Tulip Hill was left to Nancy Poore Tufts for her lifetime, with a vested remainder over to Suzanne P. Poore, the remainder being subject to divestiture upon the happening of certain conditions which are not material here.

2. Personal effects, and household goods were left to Nancy Poore Tufts for her lifetime, with remainder to Suzanne P. Poore, the remainder being subject to divestment as in item 1 above.

3. A brick house and lot in Washington, D. C., was left to Colonel James Edward Poore, Jr., in fee simple.

4. and 5. One thousand dollars in government bonds or the equivalent in cash was left to each of the following grandchildren of the testatrix: James Edward Poore, III, Gerald G. Poore, Walter H. Poore, Richard T. Poore, Thomas W. Poore and to her daughter-in-law, Elizabeth Gilbert Poore.

6. The residue of the estate, including all cotton mill and bank stock, bonds, building and loan accounts and cash, was given one-half to Colonel James Edward Poore, Jr., outright, and one-half to Nancy Poore Tufts for her lifetime, with a remainder over to Colonel James Edward Poore, Jr., or his issue.

William O. Tufts was not left anything in the will. The testatrix did, however, include a request that her son-in-law be permitted to live at Tulip Hill after the death of Nancy Poore Tufts, so long as he should remain unmarried.

In September, 1952, the testatrix underwent an operation. She was hospitalized until January, 1953. She stood the operation fairly well, although she was confined to a wheelchair for a time and was obliged to utilize a nephrector tube. De-

spite these handicaps, she remained quite active and it is not disputed that she was mentally alert until her death. In the winter of 1954-1955, the testatrix planned a trip (her second) to Europe in the company of Mr. and Mrs. Tufts. In June of 1955, the testatrix wrote to her daughter-in-law, Elizabeth G. Poore, and requested that she and her husband come to Tulip Hill for the summer of 1955 in order to take care of the house in her absence. The Poores arrived at Tulip Hill on approximately the 29th of June, 1955. In the meantime, Colonel Poore, Jr., who had been suffering from tuberculosis for some time, became seriously ill. When the Colonel and his family arrived in Maryland, the former was immediately taken to Walter Reed Hospital where it was found he had leukemia. Elizabeth G. Poore and her children, Captain James Edward Poore, III, Richard T. Poore, Suzanne P. Poore and Thomas W. Poore, stayed at Tulip Hill.

On July 3, 1955, the testatrix telephoned neighbors, Hilda N. Himmler and James B. and Henrietta Gillespie, and requested them to come to Tulip Hill and witness a codicil to her will. The three witnesses arrived in the early evening. Prior to their arrival, Nancy Poore Tufts, according to her testimony, had typed up her mother's codicil from a copy of a longhand draft furnished her by the testatrix. The testatrix and the three witnesses gathered in the living room at Tulip Hill and the codicil was executed with all proper legal formalities. At the same time and utilizing the same witnesses, Nancy Poore Tufts executed a will of her own.

The codicil executed on July 3, 1955, contained the following provisions:

(1) Nancy Poore Tufts was left Tulip Hill, in fee simple.

(2) Nancy Poore Tufts was left one-half "my mill and bank stocks, bonds, building and loan, and all cash monies," absolutely, with the request that she divide them equally among the testatrix' grandchildren upon her death.

(3) Elizabeth G. Poore was left "all my stock in the Charlestown National Bank."

(4) William O. Tufts was left 25 shares of "PEPCO" stock.

(5) Nancy Poore Tufts was requested to divide her father's guns and trophies among the testatrix' grandchildren.

After the two documents were signed, the testatrix requested Mr. Tufts to take them upstairs and put them on her desk. Mr. Tufts did so. On July 6, 1955, the testatrix, together with Mr. and Mrs. Tufts, departed for Europe. They returned to Tulip Hill on approximately the 20th of August, 1955.

The papers remained in Pearl Payseur Poore's room until she and the Tufts returned from Europe. Nancy Poore Tufts and William O. Tufts both testified that it had been their intention and that of the testatrix to deposit the documents in the safe deposit boxes before the trip, but that due to the heat of the summer and the pressure of time, the trip to the bank was never made. A few days after the return from Europe, Mrs. Tufts placed her mother's codicil in her mother's lock box at the bank; she put her own will in a strong box in her study.

Colonel James Edward Poore, Jr., died on October 14, 1955. After her brother's death and before her mother's, Nancy Poore Tufts destroyed the will she had made on July 3, 1955, and has made no other. She testified that she did this because her brother was a beneficiary under the will and that she thought his death made a new will necessary. Mrs. Tufts did not tell her mother that the will was destroyed. The testatrix died on February 21, 1956.

## I

The principal question involved herein is whether there was sufficient evidence upon which to submit the issue of fraud to the jury. In making such a determination in this type of case, we must, in accordance with the rule generally, examine all of the evidence offered on behalf, and in favor, of the *caveators*, assume its truth, and then consider it, together with all reasonable inferences that may be drawn therefrom, and decide whether the jury could reach a rational conclusion that the codicil was induced by fraud perpetrated upon Mrs. Poore. *Smith v. Diggs*, 128 Md. 394, 396, 97 A. 712.

There was testimony and reasonable inferences to be drawn

therefrom from which the jury could have concluded: that the testatrix was a lady who had deep bonds of love and affection for her son and his family, and wanted him or one of his children ultimately to inherit not only Tulip Hill, the lovely home on the Potomac, but substantially all of her considerable personal estate;[1] that there was no hope of descendants through her daughter; that she had a pronounced dislike for her son-in-law; that her intention, as expressed in her will of 1948, was that Mrs. Tufts would inherit only a life estate in the property left her; and that the testatrix executed the codicil at her daughter's request and importuning upon the representation that the codicil would save the daughter embarrassment and that it would not substantially alter the disposition of her mother's estate as provided in the 1948 will, because the daughter would simultaneously execute and continue in existence a will of her own which would accomplish substantially the same disposition of her mother's estate. There was also evidence and inferences to be drawn therefrom from which the jury could have further concluded: that the testatrix' codicil and the daughter's will, her first and only one, were executed at the same time and place and attested by the same witnesses; that both instruments were taken into the custody and control of the mother and remained in her room at Tulip Hill until the mother and daughter returned from Europe; that the instruments were taken from the mother's room by the daughter, and the mother's codicil was placed in a lock box at the bank, but the daughter's will was retained by the daughter at the residence; that the daughter destroyed her will shortly after her return, on August 20, 1955, from the trip abroad (she testified she destroyed it after her brother's death on October 14, 1955, but before her mother's decease in February, 1956) without advising her mother, and has made no other; that at the time the daughter promised her mother to execute and con-

---

1. In addition to the other evidence, the testatrix had written her son and daughter-in-law as late as 1949 saying: "Of course you understand that everything I own will eventually go into your estate." Exhibit 5, admitted without objection.

tinue in existence a will that would dispose of the mother's estate substantially in accordance with the mother's will, the daughter made the promise with a present intention not to perform her agreement; and that the daughter's promise was made with the intention of deceiving her mother, it did deceive the mother and induce her to make the codicil, and without which she would not have made it.

Something should be said with reference to what has just been stated concerning the permissible inference of the daughter's intention at the time of making the promise. A person's intention or state of mind at any particular time is difficult to prove. A fraudulent pre-existing intent not to perform a promise made cannot be inferred from the failure to perform the promise alone. *Lipp v. Lipp,* 158 Md. 207, 216, 148 A. 531. But, it may be considered with the subsequent conduct of the promisor and the other circumstances surrounding the transaction in sustaining such an inference. *Lipp v. Lipp, supra,* at page 216, and page 219; *Councill v. Sun Ins. Office,* 146 Md. 137, 150, 126 A. 229; Annos., 51 A. L. R. 165, 125 A. L. R. 892; *Cutler v. Bowen,* 51 P. 2d 164 (Cal. App., 1935). Cf. 1 Moore on *Facts,* sec. 100. And it has been stated that under certain conditions, a failure or refusal to perform is strong evidence of an intent not to perform the promise at the time it was made, as where only a short period of time elapses between the making of the promise and the failure or refusal to perform it, and there is no change in the circumstances. 24 Am. Jur. *Fraud and Deceit,* sec. 287; Anno., 51 A. L. R. 165. It has also been stated the fact that a party is largely benefited by a will prepared by him, or in the preparation of which he takes an active part, is a suspicious circumstance, of more or less significance according to the facts of each particular case, to be considered by the jury in determining the question of fraud. *Griffith v. Diffenderffer,* 50 Md. 466, 484.

In valuing facts relating to the question of a present intention not to perform a promise made, courts have frequently stressed the importance and significance of the situation of the parties, the relations existing between them, the activity of the promisor in procuring the instrument, and the failure

of the promisor to perform. *Lipp v. Lipp, supra,* at page 217. Applying these principles to the facts or the instant case as related above, the evidence permitted an inference that at the time Mrs. Tufts made the promise to her mother, she did not intend to perform it. *Councill v. Sun Ins. Office, supra,* 146 Md. 150; *Lipp v. Lipp, supra,* 158 Md. 219; *Cutler v. Bowen, supra; Restatement, Contracts,* para. 473, comment (b); *The Legal Effect of Promises Made with Intent Not to Perform,* 38 Columbia L. Rev. 1461.

With this premise established, it is clear that the case was properly submitted to the jury. Professor Page states that wilfully false *statements of fact,* other than those relating to the nature of the contents of the instrument, made by a beneficiary under the will which is thus induced, which are intended to deceive, and do deceive, the testator, which induce him to make the will, and without which he would not have made such will, constitute fraud in the inducement to make a will (as distinguished from fraud in the execution). 1 Page, *Wills* (Lifetime Ed.), sec. 179. This Court has held many times that the *existing intention* of a party at the time of contracting is a matter of fact. Among the cases so holding, see *Brager v. Friedenwald,* 128 Md. 8, 33, 97 A. 515; *Gale v. McCullough,* 118 Md. 287, 293, 84 A. 469; *Lipp v. Lipp, supra,* 158 Md. 216. See also *Councill v. Sun Ins. Office, supra,* 146 Md. 150, where this Court quoted with approval the famous statement of Lord Bowen in an action of deceit:[2] "There must be a misstatement of an existing fact; but the state of a man's mind is as much a fact as the state of his digestion."

Maryland has adopted the overwhelming majority rule of the American courts in holding that fraud may be predicated on promises made with a present intention not to perform them. *Councill v. Sun Ins. Office, supra; Brager v. Friedenwald, supra; Gale v. McCullough, supra; Ortel v. Upper Ashburton Realty Company,* 171 Md. 678, 683, 190 A. 239. See also 23 Am. Jur. *Fraud and Deceit,* para. 106; *Restatement, Contracts,* para. 473; Annos., 51 A. L. R. 63, 68 A. L. R. 637,

---

2. *Edgington v. Fitzmaurice,* 29 Ch. Div. 483.

91 A. L. R. 1297, 125 A. L. R. 879. The gist of the fraud in such cases is not the failure to perform the agreement, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact non-existent, and the deception of the promisee by such false promise. While most of the myriad of cases that have applied the doctrine relate to commercial transactions, it has been utilized to establish fraud where the annulment of marriage was being sought,[3] and in avoiding a will made as a result of such fraud. *Gordon v. Burris,* 54 S. W. 546 (Mo.). This Court stated, as early as 1833 through Chief Judge Buchanan, in *Davis v. Calvert,* 5 Gill & J. 269, 303:

> "Fraud vitiates every thing with which it is connected. A will or testament therefore, which is obtained by fraud is void, and though fraud is never to be presumed, yet it is not necessary to prove it by positive and direct testimony. But being usually wrapt up in mystery, if well concerted, it is generally by circumstances only, by inductions of particulars, some of them often apparently trivial, that it can be brought to light and defeated."

From what has been said above, it will be seen that the evidence adduced and the reasonable and proper inferences that could be drawn therefrom were sufficient to permit the jury (they being the sole judges of the weight to be given the evidence) to find all of the elements and factors requisite to constitute fraud; hence the case was properly submitted to them for decision.

## II

At the trial below, the appellees-plaintiffs offered and had admitted into evidence, over objections by the appellants, fourteen letters purportedly written by the testatrix, most of which were sent to her deceased son but several had been

---

3. Drexler, *Annulment of Marriage for Fraud in New York,* 71 U. S. L. Rev. 318, 325 *et seq.;* Brown, *Duress and Fraud as Grounds for the Annulment of Marriage,* 10 Ind. L. J. 473, 479 *et seq.* Anno., 28 A. L. R. 2d 504; *Anders v. Anders,* 113 N. E. 203 (Mass.); *Moore v. Moore,* 157 N. Y. S. 819.

addressed to her daughter-in-law, Elizabeth G. Poore. Only excerpts from the exhibits were read to the jury. We do not deem it necessary to set forth each exhibit and make individual rulings thereon. Four of them, exhibits 2, 3, 4 and 7 ranging in dates from 1945 to 1951, were simply short pleasantries relating to her feelings concerning her grandchildren; four, exhibits 8, 9, 10 and 11 ranging in dates between 1946 and 1954, expressed a dislike for her son-in-law; two, exhibits 12 and 13 written in 1952 and 1955, respectively, related to the testatrix' feeble health; three exhibits 6, 12 and 17, will be considered individually later; and one, exhibit 15 dated 1955, again referred to the testatrix' ill health and made commendatory remarks concerning her daughter-in-law and grandchildren. None of the exhibits was submitted with accompanying envelopes and they were all authenticated by the daughter-in-law.

The letters were objected to upon individual grounds, but (excepting at this stage exhibits 6, 12 and 17) the grounds of objection may be grouped. They were immateriality, dates not established independently of the contents of the letters and remoteness.

The objections to the four exhibits, and that part of exhibit 15, which contained brief statements of affection for the grandchildren may be disposed of quickly. If we assume without deciding that they were inadmissible, their admission was not prejudicial, as it is conceded by the appellants that the testatrix was fond of, and had affection for, these grandchildren.

Directing our attention now to the letters that referred to the testatrix' health and her dislike for her son-in-law in regard to their relevancy and remoteness, we think they were admissible. It will be recalled that when the testimony was taken, there were two issues before the court and jury: undue influence and fraud. It is well recognized that in will cases where fraud and undue influence are charged, the character and degree of the fraud practiced and the influence exerted necessarily involve, to some extent, the physical and mental condition of the testatrix at the time of the execution of a will or codicil, as well as her relations with, and feelings

toward, those around her and the persons who are the beneficiaries of her bounty; and sometimes the declarations of the testatrix are the most satisfactory proof thereof. The rule is well and rather fully considered in *Griffith v. Diffenderffer, supra,* 50 Md. 480, 481, and in *Griffith v. Benzinger,* 144 Md. 575, 594, 125 A. 512;[4] so, we shall not repeat it, in full here. And it is well established that where questions of fraud (*Davis v. Calvert, supra*) or undue influence (*Clark v. Stansbury,* 49 Md. 346, 351) are involved any evidence, however slight, tending to prove the issues is admissible. The letter in 1946 concerning the son-in-law, if considered alone may well have been determined as too remote to have had any probative value, but the other letters and testimony showed a continuity of the same feeling by the testatrix down to the making of the codicil.

With reference to the objection that the dates of the letters, in some instances, were not established by evidence independent of the contents of the letters, we know of no principle of law that prevents a witness from arriving at the date of a letter from its contents, provided it may be done with reasonable accuracy, such as the fact that the witness received the letter while in Australia and remembers that she was in Australia at a particular time, or that the letter was written when the writer was in the hospital for a particular illness and the witness remembers the time the writer was there.

This leaves for consideration exhibits 6, 12 and 17. Exhibit 6 was a letter written in 1948 by the testatrix to her daughter-in-law. It stated that two of her grandchildren had been bringing in rocks for her new beds (presumably flower beds), and that in order to build up their enthusiasm for the work, the writer had told the boys they were only helping to improve their own property as one of them would surely inherit Tulip Hill someday. This exhibit was objected to on only two grounds: that the date appeared to be in 1948 and therefore "might conceivably be prior" to the date of the 1948 will; and the exhibit consisted of almost a full page of writing, purporting to be a letter, which was obviously a continu-

---

4. See also *Snyder v. Cearfoss,* 190 Md. 151, 157, 57 A. 2d 786; 2 Jones, *Evidence* (5th ed.) sec. 515, p. 996; Anno., 79 A. L. R. 1459.

ation of some "additional paper," and did not bear the signature or any identifying mark of the writer. The appellants argue that the possibility that the letter was written before the 1948 will rendered it too remote; because the 1948 will was conceded to be valid by the appellees. It is apparent that this reason, alone, would not make the letter inadmissible, for it is stated in *Snyder v. Cearfoss, supra,* 190 Md. 151, 157, that prior declarations made by a testator as to his testamentary intentions are admissible to show that his will is consistent with his long cherished wishes. The other ground of objection is also unsound. The witness had identified the letter as being written by the testatrix to her in 1948, it was written on paper bearing the printed letter-head of the testatrix and the witness explained the other page of the letter had been lost.

Exhibit 12 was a letter written by the testatrix in 1953, the only part of which that was read to the jury was a short statement referring to her health. It was objected to on the grounds of lack of proper identification, remoteness and immateriality. Again if we assume, without deciding, that it was not properly identified, its admission was not reversible error; since it was merely cumulative in nature and not of too serious import.

Exhibit 17 was a letter written by the testatrix in 1954 to her son which showed affection and admiration for him. The ground of the objection was that its contents were immaterial. During the course of the trial, the *caveatees* had offered certain testimony tending to indicate a waning of the affection of the mother for her son. The letter was offered in rebuttal for the purpose of refuting this testimony of the *caveatees.* Under these circumstances, we think the letter was admissible.

### III

The appellants further contend that if their other arguments fail, the appellees' case, at most, amounted merely to a case of partial invalidity. This question was not raised or considered below; so we do not think it is properly before us. Maryland Rule 885.

*Rulings affirmed, with costs.*